PUBLIC CITIZEN, INC., et
al., Petitioners,

v.

U.S. NUCLEAR REGULATORY COM-
MISSION and the United States of
America, Respondents,

City of Tucson, Arizona, Intervenor.

No. 90–1432.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 22, 1991.

Decided Aug. 2, 1991.

Patti A. Goldman, with whom Alan B. Morrison, Timothy J. Harrison and Dan W. Reicher, were on the joint brief, for petitioners and intervenor, City of Tucson, Ariz.

Marjorie S. Nordlinger, Atty. Nuclear Regulatory Com'n, with whom William C. Parler, Gen. Counsel, John F. Cordes, Jr., Sol., E. Leo Slaggie, Sp. Counsel, Nuclear Regulatory Com'n, Richard B. Stewart, Asst. Atty. Gen., and Ellen J. Durkee, Atty. Dept. of Justice, were on the brief, Washington, D.C., for respondents. Martin W. Matzen, Atty. Dept. of Justice, also entered an appearance, Washington, D.C., for respondents.

Robert Abrams and E. Gail Suchman, for the State of N.Y., Theodora Berger, Los Angeles, Cal., Craig C. Thompson, Sacramento, Cal., and Susan L. Durbin, Los Angeles, Cal., for the State of Cal., Joseph Rubin, Hartford, Conn., for the State of Conn., Jon Glogau, Hollywood, Fla., for the State of Fla., and Gini Nelson, Santa Fe, N.M., for the State of N.M. were on the joint brief for amici curiae urging that this Court declare that the Policy Statement does not preempt state legislating materials and practices designated BRC by the federal government.

Before BUCKLEY, WILLIAMS and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

Last summer the Nuclear Regulatory Commission published a document it styled a "policy statement" endorsing regulatory exemptions for practices that expose the public to radiation in such minute amounts as to be "below regulatory concern". *Below Regulatory Concern; Policy Statement,* 55 Fed.Reg. 27,522 (1990) ("BRC Policy Statement"). The petitioners, a group of 29 citizen, consumer and environmental organizations as well as the State of Maine, claim that the BRC policy is in fact a substantive rule adopted in violation of the Administrative Procedure Act's notice and comment requirements. See 5 U.S.C. § 553 (1988); compare *id.* § 553(b)(A) (exemption for "general statements of policy"). Because the intended effect of the policy statement is not clear on its face, and the Commission has yet to employ it in a specific rulemaking or licensing proceeding, we find the challenge unripe.

I

Both Congress and the NRC have long recognized the need to exempt certain uses of radioactive materials from the Commission's pervasive licensing requirements. See, e.g., Atomic Energy Act, 42 U.S.C. § 2111 (1988). Up to now the NRC's exemption decisions have proceeded piecemeal. See, e.g., 10 CFR § 30.15(a) (1991) (exemptions through rulemakings); *id.* § 30.11(a) (case-by-case exemption orders). Spurred by congressional interest in such exemptions, see, e.g., Low–Level Radioactive Waste Policy Amendments Act of 1985, 42 U.S.C. § 2021j (1988), as well as the development of BRC policies at other agencies and reports from the Commission staff that nuclear reactor operators were irradiating gemstones, such as topaz, for the consumer market, the NRC decided to develop a comprehensive policy that would "identify a level of radiation risk below which government regulation becomes unwarranted." Memorandum from Andrew L. Bates, Acting Secretary, NRC (Nov. 24, 1987), *reprinted in* Joint Appendix ("J.A.") at 97; see also 51 Fed.Reg. 43,367 (1986).

In December 1988 the Commission issued an advance notice of a proposed policy statement on exempting from regulation practices "whose health and safety impacts could be considered below regulatory concern." 53 Fed.Reg. 49,886, 49,886/3 (1988). After holding a public meeting, receiving extensive public comments, and participating in an international workshop on the subject, the Commission published a final policy statement on July 3, 1990. BRC Policy Statement, 55 Fed.Reg. at 27,522. The statement defines a region, based on

individual and collective dose thresholds, where the Commission believes that regulation is no longer warranted. The statement envisions exemptions for practices that produce an average dose to individuals in the "critical group"[1] of less than 10 millirem (mrem) per year and a collective dose of less than 1000 person-rem per year.[2] *Id.* at 27,527. These numbers were based on the level of natural background radiation that members of the public routinely accept in daily life, as well as epidemiological evidence. *Id.* at 27,526–27. In a typical roundtrip coast-to-coast flight, for example, a passenger will receive a 5 mrem dose from natural background radiation. *Id.* at 27,527/1.

Besides setting out these numerical thresholds, the policy statement also indicates a shift in the Commission's attitude toward two other factors affecting exemption: requiring social justification and making any radiation exposure as low as is reasonably achievable. *Id.* at 27,526/1. Whereas formerly the Commission had considered whether a practice was justified in terms of "net societal benefits" (i.e., whether the opportunity costs of prohibition outweighed the benefits), see, e.g., 30 Fed. Reg. 3462 (1965) (earlier policy statement on uses of radioactive material in consumer products), the BRC policy statement said it would no longer do so. 55 Fed.Reg. at 27,526/1. And, although the Commission does not abandon its belief that the collective dose from all practices, including exempt practices, should be as low as is reasonably achievable, it concludes that its resources would not be wisely spent trying to hold exempt practices to that principle. *Id.* at 27,527/3; see also *id.* at 27,528/1–2.

**1.** The "critical group" is "the group expected to receive the highest exposure" to radiation. 55 Fed.Reg. at 27,526/2.

**2.** A dose of one person-rem per year is equivalent to one person receiving a one rem dose of radiation during the course of one year. The policy statement concludes that individual doses below 0.1 mrem per year should not be measured and included in the calculation of collective doses. See 55 Fed.Reg. at 27,527/3–28/1.

■ The petitioners challenged the policy statement both on substantive grounds, arguing that it is contrary to statutory authority as well as arbitrary and capricious, and on procedural grounds, arguing that it was issued without proper notice and opportunity to comment and also that it should have been accompanied by an environmental impact statement. Through candid briefing, the parties have narrowed their dispute considerably. The Commission appears to admit that it did not comply fully with the APA's notice and comment requirements because it considers the BRC policy a "general statement of policy" exempted from those requirements. See Brief for Respondents at 26. The petitioners in turn agree that the court need not reach their substantive claims, for if the court decides that the Commission "has not yet finalized its decisions" the substantive claims will not be ripe, while if it decides otherwise petitioners will win on their procedural claim. Reply Brief at 3. Indeed, if the government's litigating position—that the BRC policy is not a substantive rule— estops the Commission from arguing in the future that the policy was adopted as a substantive rule, a point not altogether clear, see *Clarke v. United States*, 915 F.2d 699, 702 (D.C.Cir.1990) (en banc); *Farmland Indus., Inc. v. Grain Bd. of Iraq*, 904 F.2d 732, 739 (D.C.Cir.1990), then petitioners could not be injured by any want of notice and comment and their claim would be moot. We rest our decision, however, on the conclusion that the dispute is not ripe.[3]

## II

■ In determining whether an agency statement is a substantive rule, which re-

**3.** The Commission agrees with the petitioners "that the question ... whether the policy statement amounts to a substantive rule is ripe". Brief for Respondents at 31. But because of the judicial interests manifested in the ripeness doctrine, an agency cannot concede ripeness, and this court freely raises the issue on its own. See *NRDC v. EPA*, 859 F.2d 156, 165–66 (D.C.Cir. 1988); *Office of Communication of the United Church of Christ v. FCC*, 826 F.2d 101, 104 n. 2 (D.C.Cir.1987); *American Trucking Ass'ns v. ICC*, 747 F.2d 787 (D.C.Cir.1984).

quires notice and comment, or a policy statement, which does not, the ultimate issue is "the agency's intent to be bound". *Vietnam Veterans v. Secretary of the Navy*, 843 F.2d 528, 538 (D.C.Cir.1988). Substantive rules are ones treated as binding by the agency, while true policy statements are not. *Id.* at 536–38. Sometimes a simple reading of the document and study of its role in the regulatory scheme will yield the answer. See, e.g., *NRDC v. EPA*, 859 F.2d 156, 190–91 (D.C.Cir.1988); *Telecommunications Research & Action Center v. FCC*, 800 F.2d 1181, 1186 (D.C. Cir.1986); *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 538–39 (D.C. Cir.1986); *Pacific Gas & Electric Co. v. FPC*, 506 F.2d 33, 40–45 (D.C.Cir.1974).

■ Here, however, the Commission's policy statement sends mixed messages. As the petitioners point out, the statement uses some unequivocal language. For example, the Commission states that the policy *"establishes* a baseline level of risk beyond which further government regulation to reduce risks is unwarranted." BRC Policy Statement, 55 Fed.Reg. at 27,526/2 (emphasis added); see also *id.* at 27,527/2 ("continued regulatory controls are unnecessary and unwarranted" below the individual dose thresholds set out in the policy statement). The policy statement also announces, in a break with prior NRC policy, that "the Commission *will not consider* whether a practice is justified in terms of net societal benefit." *Id.* at 27,526/1 (emphasis added). The policy statement further "concludes" that in the assessment of a practice's collective dose, it is appropriate to exclude from the calculation individual doses below 0.1 mrem per year. *Id.* at 27,528/1.

There are as many indications cutting the other way, however. The introduction of the policy statement contains this explanation: "In today's notice, the Commission establishes a policy *to guide its decisions* on which radioactive materials are 'below regulatory concern'.... This policy translates the Commission's judgement on acceptable risk into explicit and practical criteria *on which to base decisions* to exempt

practices from the full scope of NRC's regulatory program." *Id.* at 27,523/1 (emphasis added). The policy statement makes it clear that the decisions have not yet been taken: "These decisions will be implemented by the Commission through rulemakings and licensing decisions based on careful and thorough analyses of the risks associated with specific practices to ensure that the public is adequately protected." *Id.* at 27,523/1. It sounds these themes frequently, with references to the statement as establishing "a unifying risk framework for making decisions", see *id.* at 27,523/2; see also *id.* at 27,525/3 (statement establishes "the risk framework within which the Commission will initiate the development of appropriate regulations or make licensing decisions"), and to its plans for implementation through both rulemakings and individual licensing decisions, see *id.* at 27,523/2, 27,525/3, 27,528/1–2 (section on "Implementation"). The statement also notes that the Commission "may determine on the basis of risk estimates and associated uncertainties that certain practices should not be considered candidates for exemption, such as the introduction of radioactive materials into products to be consumed or used primarily by children", *id.* at 27,526/1, contradicting petitioners' argument that the Commission will automatically exempt any practice that involves dose levels below those specified.

Where the language and context of a statement are inconclusive, we have turned to the agency's actual applications. For example, in *McLouth Steel Products Corp. v. Thomas*, 838 F.2d 1317 (D.C.Cir.1988), we examined a model that the EPA used in computing probable contamination levels in hazardous waste. The agency had used equivocal language, suggesting in some passages that it retained discretion to deviate from the model's results, but in others that it would treat the model as binding. 838 F.2d at 1320. Our decision that the model was a substantive rule rested on our conclusion that the agency's conduct in applying the model, "[m]ore critically than EPA's language adopting the model," demonstrated its binding character. 838 F.2d at 1321. Other cases concerned with the

policy statement/substantive rule distinction confirm that the agency's application of a disputed rule is crucial. See *Community Nutrition Inst. v. Young*, 818 F.2d 943, 949 (D.C.Cir.1987) (notice-and-comment procedures required where the FDA, "by virtue of its own course of conduct", had given action levels a "present, binding effect"); *Batterton v. Marshall*, 648 F.2d 694, 706 (D.C.Cir.1980) (agency's course of conduct revealed that methodology was not merely a policy statement); see also *Vietnam Veterans v. Secretary of the Navy*, 843 F.2d 528, 539 (D.C.Cir.1988) (agency application of the document in a flexible manner supports classification as a policy statement); *American Bus Ass'n v. United States*, 627 F.2d 525, 532–33 (D.C.Cir. 1980) (two applications cited); *Guardian Federal Savings & Loan Ass'n v. Federal Savings & Loan Insurance Corp.*, 589 F.2d 658, 666–67 (D.C.Cir.1978) ("a critical test" is practical effect in later proceedings, one of which is discussed).

The statement's own signals being in conflict, only Commission practice under the policy can make the issue determinable and thus fit for review. See *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). At times we have resolved the sort of claim presented here—that a purported policy statement was really a rule invalid for want of notice and comment—even before agency application. See, e.g., *NRDC v. EPA*, 859 F.2d 156, 190–91 (D.C.Cir.1988); *American Hospital Ass'n v. Bowen*, 834 F.2d 1037, 1057 (D.C.Cir.1987). In *NRDC*, however, the court evidently did not believe that resolution of the claim hinged upon how the agency would act, while *Bowen* suggests the hazard in resolving such a challenge where the pre-application materials are inconclusive. Although we ruled in *Bowen*, we also hedged our bets by reserving the right to change our decision based on actual applications of the policy: "A policy initially classed as a general statement [of policy] is not immunized from subsequent judicial review for conformity with the APA if later developments show the agency to be using it as binding policy." *Id.* at 1057 n. 4; see also *id.* at 1056.

Where we believed the agency's practical application of a statement would be important, we have found the issue not ripe. See, e.g., *National Ass'n of Regulatory Utility Comm'rs v. Department of Energy*, 851 F.2d 1424, 1430 (D.C.Cir.1988). The judicial process would clearly gain by waiting for a concrete application.

Nor have the petitioners established that withholding court consideration would inflict any hardship. See *Abbott Laboratories v. Gardner*, 387 U.S. at 149, 87 S.Ct. at 1515. The petitioners cannot point to any present hardship that they will suffer if we refuse to rule on their claims, since as even they acknowledge, "the policy statement is not self-executing." Reply Brief at 13. As the Commission made clear in the statement, regulated parties cannot change their conduct under the policy until they secure an exemption through future rulemaking or licensing proceedings.

 The best that the petitioners can offer on the hardship front is the prospect of future trouble—that the Commission will grant exemptions under the statement, which will prove unreviewable by virtue of the statutory 60–day limit. See 28 U.S.C. § 2344 (1988); Reply Brief at 4. Of course a time limit on review cannot bar claims that have been held unripe in a suit brought within the deadline. See *Eagle–Picher Indus. v. EPA*, 759 F.2d 905, 909, 912 (D.C.Cir.1985). Though the time limit has worked here to engender otherwise unnecessary litigation, the finding of unripeness gives petitioners the needed assurance.

Petitioners suggest a further hazard in the form of clandestine agency conduct. Although they acknowledge that they can intervene in any future rulemaking or licensing proceeding to grant exemptions under the policy, as can "any person whose interest may be affected by the proceeding," see 42 U.S.C. § 2239(a)(1) (1988), they claim that the Commission could grant a license in such a proceeding without giving notice beforehand. See *id.* § 2239. Then, the argument goes, the Commission in later proceedings could invoke the first licensing decision as a precedent, despite its having

escaped judicial review. The Commission has committed itself in the policy statement, however, to giving the public advance warning and a chance to participate in licensing proceedings growing out of the BRC policy: "[O]pportunity for public comment will be provided with each rulemaking and *each licensing action* where generic exemptions provisions have not already been established." BRC Policy Statement, 55 Fed.Reg. at 27,525/3 (emphasis added); see also *id.* at 27,528/2 (similar). We have no reason to doubt this commitment, so we need not speculate on whether the Commission could use such a stratagem to transform a purportedly nonbinding policy into a binding precedent. Accordingly, and even assuming that the claim is close enough to fitness for review that a showing of hardship would enable us to eke out a ripeness finding, petitioners have not shown any such hardship.

### III

The petitioners also claim that the Commission violated the National Environmental Policy Act by adopting the BRC policy statement without preparing an environmental impact statement, which must accompany all "proposals" for "major Federal action". See 42 U.S.C. § 4332 (1988); see also *Kleppe v. Sierra Club,* 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). They point to Council on Environmental Quality regulations that identify certain conduct as "Federal actions" for NEPA purposes, including "official polic[ies] ... adopted pursuant to the Administrative Procedure Act" and "formal documents establishing an agency's policies which will result in or substantially alter agency programs". 40 CFR § 1508.18(b)(1) (1990). The petitioners believe that the Commission should have developed a "programmatic EIS" to accompany its statement. Compare *Foundation on Economic Trends v. Lyng,* 817 F.2d 882 (D.C.Cir.1987).

The proper time for preparation of an EIS is far from obvious. We have noted that NEPA values "pull[ ] in two directions. Statements must be written late enough in the development process to

contain meaningful information, but they must be written early enough so that whatever information is contained can practically serve as an input into the decision making process." *Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n,* 481 F.2d 1079, 1094 (D.C.Cir.1973). From the nature of the trade-off, it follows that the agency must have considerable discretion in picking the right moment. See *Kleppe,* 427 U.S. at 406, 96 S.Ct. at 2728; *National Wildlife Federation v. Appalachian Regional Comm'n,* 677 F.2d 883, 889 n. 35 (D.C.Cir.1981). The Commission argues here that its BRC policy is not mature enough to constitute a "proposal" for "action", and we are not in a position to find the contrary. It emphasizes that the policy statement does not allow those in possession of radioactive materials to change their conduct without first applying for an exemption, and that no exemptions will be granted automatically, so the BRC policy will have *no* effect until the Commission itself takes further, unknown decisions. Besides, the policy statement noted that implementation would entail "thorough analyses of the risks associated with specific practices", 55 Fed.Reg. at 27,523/1, suggesting the problems of trying to draft an EIS before *any* of those analyses are done. On precisely the issue that most calls for a programmatic statement, the cumulative effect of multiple exposures to different exempted practices involving widespread distribution of radioactive materials, the Commission explicitly recognized the need to "gain[ ] more experience", *id.* at 27,527/2, and in the meantime anticipated use of an especially low individual dose threshold (one millirem per year) for such practices. *Id.* Because the Commission has not yet made the key decisions that will result in a particular "course of action", see *Sierra Club v. Peterson,* 717 F.2d 1409, 1414 (D.C.Cir.1983); *Defenders of Wildlife v. Andrus,* 627 F.2d 1238, 1243 (D.C.Cir.1980), we decline to order it to prepare an environmental impact statement now.

The Commission acknowledges that the time will come. In the policy statement itself it stated that any rulemaking action

taken to implement the policy "would include an appropriate level of environmental review in accordance with the Commission's regulations in 10 CFR part 51, which implement the National Environmental Policy Act." BRC Policy Statement, 55 Fed. Reg. at 27,528/1. The petitioners' fears that the Commission will avoid a programmatic EIS by examining the environmental impact of isolated exemptions only is premature. Moreover, the very existence of the policy statement will (ironically) give petitioners an argument that the BRC exemptions are so "related" as to require a programmatic EIS once the Commission actually confronts a specific request for exemption. Compare *Kleppe*, 427 U.S. at 410, 96 S.Ct. at 2730; *Foundation on Economic Trends*, 817 F.2d at 885.

\* \* \* \* \* \*

On July 1, 1991 the NRC filed a letter with the court reporting that it had "declar[ed] a moratorium on the implementation" of the BRC policy statement and that it had issued an order to its staff "instituting an across-the-board consensus-building process on all BRC issues", with a target date of December 1992. Accordingly, the Commission raised the issue of whether the court might "choose not to devote further resources to this lawsuit while the Commission consensus process goes forward." As we decide, based on the status of the case at argument, that both the APA and NEPA challenges are premature, we need not consider whether the new developments create additional grounds for deferring review. The petition for review is

*Denied.*