**ALLIANCE FOR BIO–INTEGRITY,
et al., Plaintiffs,**

v.

**Donna SHALALA, et al., Defendants.**

**No. Civ.A. 98–1300(CKK).**

United States District Court,
District of Columbia.

Sept. 29, 2000.

Joseph Mendelson, III, Andree C. Kimbrell, Washington, DC, for plaintiffs.

Mark E. Nagle, Meredith Manning, U.S. Atty's Office, Washington, DC, Andrew E. Clark, U.S. Dept. of Justice, Washington, DC, for defendants.

## MEMORANDUM OPINION

KOLLAR–KOTELLY, District Judge.

Technological advances have dramatically increased our ability to manipulate our environment, including the foods we consume. One of these advances, recombinant deoxyribonucleic acid (rDNA) technology, has enabled scientists to alter the genetic composition of organisms by mixing genes on the cellular and molecular level in order to create new breeds of plants for human and animal consumption. *See* Pls.' Statement of Material Facts Not in Dispute ¶¶ 1–3 ["Pls.' Stmt."]; Defs.' Statement of Material Facts Not in Dispute ¶¶ 6–7 ["Defs.' Stmt."]. These new breeds may be designed to repel pests, retain their freshness for a longer period of time, or contain more intense flavor and/or nutritional value. *See* Pls.' Stmt. ¶¶ 5–6; Defs.' Stmt. ¶ 8. Much controversy has attended such developments in biotechnology, and in particular the production, sale, and trade of genetically modified organisms and foods. The above-captioned lawsuit represents one articulation of this controversy.

Among Plaintiffs, some fear that these new breeds of genetically modified food could contain unexpected toxins or allergens, and others believe that their religion forbids consumption of foods produced through rDNA technology. *See* Pls.' Cross Mot. for Summ.J. ["Pls.' Mot. Summ.J."], Ex. 2 (Fagan Aff.); Ex. 3 (Lacey Aff.); Ex. 4 (Regal Aff.); Ex. 5 (Speck Aff.), Ex. 6 (Jaworowsky Aff.), Ex. 7 (Kedala Aff.). Plaintiffs, a coalition of groups and individuals including scientists and religious leaders concerned about genetically altered foods, have brought this action to protest the Food and Drug Administration's ("FDA") policy on such foods in general, and in particular on various genetically modified foods that already have entered the marketplace. The parties have filed cross-motions for summary judgment on plaintiffs' multiple claims. Upon careful consideration of the parties' briefs and the entire record, the Court shall grant Defendants' motion as to all counts of Plaintiffs' Complaint.

## I. BACKGROUND

On May 29, 1992, the FDA published a "Statement of Policy: Foods Derived From New Plant Varieties" (Statement of Policy). *See* 57 Fed.Reg. 22,984; Pls.' Stmt. ¶ 16; Defs.' Stmt. ¶ 14. In the Statement of Policy, FDA announced that the agency would presume that foods produced through the rDNA process were "generally recognized as safe" (GRAS) under the Federal Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. § 321(s), and therefore not subject to regulation as food additives. *See* 57 Fed.Reg. 22,989–91. While FDA recommended that food producers consult with it before marketing rDNA-produced foods, the agency did not mandate such consultation. *See id.* at 22,-991. In addition, FDA reserved the right to regulate any particular rDNA-developed food that FDA believed was unsafe on a case-by-case basis, just as FDA would regulate unsafe foods produced through conventional means. *See id.* at 22,990.

The Statement of Policy also indicated that rDNA modification was not a "materi-

al fact" under the FDCA, 21 U.S.C. § 321(n), and that therefore labeling of rDNA-produced foods was not necessarily required. *See id.* at 22,991. FDA did not engage in a formal notice-and-comment process on the Statement of Policy, nor did it prepare an Environmental Impact Statement or Environmental Assessment. *See id.* at 23,004–05; Pls.' Stmt. ¶ 23. At least thirty-six foods, genetically altered through rDNA technology, have been marketed since the Statement of Policy was issued. *See* Pls.' Stmt. ¶ 30; Defs.' Stmt. ¶ 21.

Plaintiffs filed a Complaint in this Court challenging the FDA's policy on six different grounds: (1) the Statement was not properly subjected to notice-and-comment procedures; (2) the FDA did not comply with the National Environmental Protection Act (NEPA) by compiling an Environmental Assessment or Environmental Impact Statement; (3) the FDA's presumption that rDNA-developed foods are GRAS and therefore do not require food additive petitions under 21 U.S.C. § 321(s) is arbitrary and capricious; (4) the FDA's decision not to require labeling for rDNA-developed foods is arbitrary and capricious; (5) the FDA's decision not to regulate or require labeling for rDNA-developed foods violates the Free Exercise Clause; and (6) the FDA's decision not to regulate or require labeling for rDNA-developed foods violates the Religious Freedom Restoration Act. *See* Pls.' Second Am.Compl. ¶¶ 129–159. Plaintiffs have also challenged on the third and fourth grounds each of FDA's specific decisions not to regulate 36 individual rDNA-produced products. *See id.* ¶¶ 160–696. The parties have filed cross-motions for summary judgment on all of Plaintiff's claims.

## II. DISCUSSION

A litigant is entitled to summary judgment when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is

only warranted where "the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact." *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1288 (D.C.Cir.1998) (en banc).

## A. Subject Matter Jurisdiction

 Defendants contend that Court lacks jurisdiction to hear plaintiffs' claims. *See* Defs.' Mot. to Dismiss, or Alternatively for Summ.J. at 15–17 ("Defs.' Mot. Summ.J."). Although Defendants have not presented this argument as a threshold to the Court's consideration of the entire case, raising it instead after developing several other arguments, the Court must treat it as such. *See, e.g., Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 94–95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) ("The requirement that jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States and is inflexible and without exception") (internal citation omitted). In particular, Defendants argue that the Statement of Policy functioned as a way for the agency to "set its own enforcement agenda," and therefore, that this enforcement action belongs to agency discretion by Congressional mandate and is not subject to judicial review. *See* Defs.' Mot.Summ.J. at 13. Although the Supreme Court held that *individual* enforcement decisions are not subject to judicial review in *Heckler v. Chaney*, 470 U.S. 821, 831, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), Defendants' attempt to extend this holding to agency decisions not to enforce against a whole *class* has not been accepted by this Circuit. *See Shell Oil Co. v. EPA*, 950 F.2d 741, 764 (D.C.Cir.1991).

The *Chaney* Court reasoned that courts reviewing agency action "need a meaningful standard against which to judge the agency's exercise of discretion." *Chaney*, 470 U.S. at 830, 105 S.Ct. 1649. Individual agency decisions not to enforce a statute "involve a complicated balancing of a number of factors," and courts do not have a meaningful standard with which to evaluate the agency's balancing. *Id.* at 831, 105 S.Ct. 1649. Therefore, these decisions are "committed to agency discretion by law" and are not subject to judicial review. 5 U.S.C. § 701(a)(2). The Court noted that an agency's enforcement discretion may be limited when Congress has "set[ ] substantive priorities, or ... otherwise circumscrib[ed] an agency's power to discriminate among issues or cases it will pursue." *Id.* at 833, 105 S.Ct. 1649. When determining if an agency action is reviewable, courts looks to "whether the applicable statutes and regulations are drawn so that a court would have a meaningful standard against which to judge the agency's exercise of discretion." *Nat'l Fed'n of Fed. Employees v. United States*, 905 F.2d 400, 405 (D.C.Cir.1990); *C C Distrib., Inc. v. United States*, 883 F.2d 146, 153 (D.C.Cir.1989).

 This Circuit has recognized a distinction between agency decisions not to regulate an entire class of conduct, which are essentially policy choices, and individual nonenforcement decisions. *See Shell Oil Co.*, 950 F.2d at 764. When an agency has employed a formal procedure, such as notice and comment rulemaking, to announce a major policy decision not to regulate certain conduct, courts can use this procedure as "a focal point for judicial review." *Nat'l Treasury Employees Union v. Horner*, 854 F.2d 490, 496 (D.C.Cir. 1988). In the instant case, even without actual notice and comment procedures, the FDA's formal publication of the Statement of Policy provides a focal point for this Court's review of the agency's action. Moreover, this Court has a meaningful standard against which to judge the Statement of Policy. Congress's passage of the various statutes on which Plaintiffs rely here—the Administrative Procedure Act, the Federal Food Drug and Cosmetic Act, the National Environmental Protection Act, and the Religious Freedom Restoration Act—has limited the FDA's enforcement discretion. Although the Court may not review FDA's policy-laden individual enforcement decisions, the Court has jurisdiction to review whether or not FDA's

Statement of Policy comports with Congressional directives.

## B. Notice and Comment

■ Plaintiffs argue that the Statement of Policy should be set aside because it was not subjected to notice and comment proceedings, as required under the Administrative Procedure Act ("APA"), 5 U.S.C. § 553. *See* Pls.' Mot.Summ.J. at 9. While conceding that the Statement of Policy did not undergo a formal notice and comment process, Defendants maintain that the Statement of Policy is a policy statement or an interpretive rule not subject to notice and comment requirements.[1] *See* Defs.' Opp'n to Pls.' Mot.Summ.J. ["Defs.' Opp'n"] at 2; *see also* 5 U.S.C. § 553(b)(3)(A) (1994) (exempting from notice and comment interpretive rules and general statements of policy). Plaintiffs contend instead that the Statement of Policy is a substantive rule, and that therefore it was improperly exempted from a formal notice and comment process. *See* Pls.' Mot.Summ.J. at 13.

■ A substantive rule, which must undergo a formal notice-and-comment process, is a rule that "implement[s]" a statute and has "the force and effect of law." *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n. 31, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979). Policy statements, on the other hand, are "statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Id.* Although the distinction between these categories is not entirely clear,[2] in *American Bus. Ass'n v. United States*, 627 F.2d 525 (D.C.Cir.1980), the Court of Appeals articulated a two-part test for determining when an agency

action is a policy statement. Policy statements (1) must not impose any new rights or obligations, and (2) must "genuinely leave the agency and its decision-makers free to exercise discretion." *Id.* at 529. In weighing these criteria, "the ultimate issue is the agency's intent to be bound." *Public Citizen v. United States Nuclear Regulatory Comm'n,* 940 F.2d 679, 682 (D.C.Cir.1991). An agency's own characterization of its statement deserves some weight, but it is not dispositive. *See Truckers United for Safety v. Fed'l Highway Admin.,* 1998 WL 151182 (D.C.Cir. 1998). Rather, courts will look to the actual language of the statement. *See Brock v. Cathedral Bluffs Shale Oil Co.,* 796 F.2d 533, 537–38 (D.C.Cir.1986).

■ By its very name, the Statement of Policy announces itself as a policy statement. More importantly, the plain language of the Statement suggests that it does not have a binding effect. For example, the Statement does not declare that transferred genetic material will be considered GRAS; rather, it announces that "such material is *presumed* to be GRAS." 57 Fed.Reg. 22989 (emphasis added). This presumption of safety is rebuttable, because FDA will "require food additive petitions in cases where safety questions exist sufficient to warrant formal premarket review by FDA to ensure public health protection." *Id.* at 22990. Rebuttable presumptions leave an agency free to exercise its discretion and may therefore properly be announced in policy statements. *See Panhandle Producers v. Econ. Regulatory Admin.,* 822 F.2d 1105, 1110 (D.C.Cir. 1987); *Mada–Luna v. Fitzpatrick,* 813 F.2d 1006, 1013 (9th Cir.1987) ("To the

---

1. Because the Court finds that the Statement is a policy statement, it does not reach the question of whether the Statement could be viewed alternatively as an interpretive rule. *See Syncor Int'l Corp. v. Shalala,* 127 F.3d 90, 94–95 (D.C.Cir.1997) (suggesting that an agency statement cannot be both an interpretive rule and a policy statement). "An agency policy statement does not seek to impose or elaborate or interpret a legal norm. It merely represents an agency position with respect to

how it will treat—typically enforce—the governing legal norm." *Id.* at 94.

2. *See Community Nutrition Inst. v. Young,* 818 F.2d 943, 946 (D.C.Cir.1987) ("The distinction between legislative rules and interpretive rules or policy statements has been described at various times as 'tenuous,' 'fuzzy,' 'blurred,' and perhaps most picturesquely, 'enshrouded in considerable smog.' ") (citations omitted).

extent that the directive merely provides guidance to agency officials in exercising their discretionary powers while preserving their flexibility and their opportunity to make individualized determination[s], it constitutes a general statement of policy"); *accord Ryder Truck Lines, Inc. v. United States,* 716 F.2d 1369, 1377 (11th Cir.1983) ("As long as the agency remains free to consider the individual facts in the various cases that arise, then the agency action in question has not established a binding norm.")

■ In response to the argument that the Policy Statement vests broad discretion with the agency, Plaintiffs contend that the FDA's application of the Statement has given it a "practical effect" that has effectively bound the agency's discretion, as evidenced by the thirty-six genetically engineered foods that are currently on the market and not regulated by the FDA. *See* Pls.' Reply to Defs.' Opp'n ["Pls.' Reply"] at 8–9. Although courts will look to the "agency's actual applications" to determine the nature of an agency statement, such an inquiry occurs "[w]here the language and context of a statement are inconclusive." *Public Citizen,* 940 F.2d at 682. Here, the plain language of the Statement clearly indicates that it is a policy statement that merely creates a presumption and does not ultimately bind the agency's discretion. *See Brock,* 796 F.2d at 537. Given this unambiguous language, this Court need not consider the agency's application of the Statement to determine the Statement's meaning.[3]

Even if, as Plaintiffs argue, FDA has previously used notice-and-comment procedures to determine GRAS status, in the instant case FDA has not determined GRAS status but has rather announced a GRAS presumption. *See* Pls.' Mot. Summ.J. at 9; *Panhandle Producers,* 822 F.2d at 1110 ("This court and others have consistently stated that an agency may announce presumptions through policy statements rather than notice-and-comment rulemaking."). The Statement of Policy creates a rebuttable presumption of GRAS that does not constrain the FDA's ability to exercise its discretion. *See Panhandle Producers,* 822 F.2d at 1110 ("Presumptions, so long as rebuttable, leave such freedom [to exercise the agency's discretion]."). Because the Statement is a policy statement merely announcing a GRAS presumption, the omission of formal notice-and-comment procedures does not violate the Administrative Procedure Act.

## C. NEPA

■ Plaintiffs have also alleged that FDA violated the National Environmental Protection Act (NEPA), 42 U.S.C. § 4321 *et seq.,* by not performing an Environmental Assessment (EA) or an Environmental Impact Statement (EIS) in conjunction with the Statement of Policy. *See* Pl.'s Mot.Summ.J. at 20. NEPA requires "all agencies of the Federal Government . . . [to] include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement . . . on the

**3.** Moreover, were the Court to consider the agency's application, Plaintiff has not shown that the agency has treated the Statement as binding. The FDA has used a food additive petition process to declare one genetically engineered food to be safe, and it has labeled two others to account for their differences from traditionally engineered foods. *See* 21 C.F.R. §§ 173.170, 573.130 (recognizing as safe the food additive aminoglycoside 3'–phospotransferase II, the additive used to genetically modify the Flavr Savr tomato); AR at 37832–33; 37836; 39947–48. Plaintiffs argue that the food additive petition for aminoglycoside 3'–phototransferase II is irrelevant

because the FDA acted on the petition before the publication of the 1992 Statement of Policy. *See* Pls.' Reply at 11; *see also* 56 Fed. Reg. 20004 (1991) (requesting notice and comment on the food additive petition). Final action on this food additive petition, however, took place in 1994, nearly two years after publication of the Statement. *See* 59 Fed.Reg. 26711 (1994). FDA proceeded with the food additive petition process even after issuing the Statement of Policy, indicating that FDA did not believe the Statement constrained its authority to consider regulations on specific genetically engineered foods.

environmental impact of the proposed action." 42 U.S.C. § 4332(2)(c)(i).

"Major federal action," as defined in the Code of Federal Regulations, includes actions such as "[a]doption of official policy ... [a]doption of formal plans ... [a]doption of programs ... [and][a]pproval of specific projects." 40 C.F.R. § 1508.18(b)(1–4). For major federal actions, agencies must either prepare an EIS examining the environmental impact of the proposed action, prepare an EA determining whether or not to prepare an EIS, or claim that the action falls within a Categorical Exclusion, "a category of actions which do not individually or cumulatively have a significant effect on the human environment." 40 C.F.R. § 1508.4 (1999). If the agency is not engaging in a major federal action, NEPA requirements do not apply. *See Macht v. Skinner,* 916 F.2d 13, 16 (D.C.Cir.1990); *see also* 42 U.S.C. § 4332(2)(c) (requiring compliance only for "proposals for legislation and other major federal actions").

■ In the Statement of Policy, FDA announces that "the activities [FDA] may undertake with respect to foods from new plant varieties ... will [not] constitute agency action under NEPA." 57 Fed.Reg. 23005. FDA's determination that the Statement is not a major federal action is essentially an interpretation of the meaning of "major federal action" in 42 U.S.C. § 4332(2)(c) and 40 C.F.R. § 1508.18. Agencies enjoy wide discretion in interpreting regulations, and the agency's interpretation will be upheld unless it is arbitrary and capricious. *See United States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977); *Nat'l Trust for Historic Preservation v. Dole,* 828 F.2d 776, 782 (D.C.Cir.1987).

The FDA's determination that the Statement was not a major federal action comports with the holdings of this Circuit, and is therefore neither arbitrary nor capricious. While declaring a rebuttable presumption that foods produced through rDNA technology are GRAS, the FDA has neither made a final determination that

any particular food will be allowed into the environment, nor taken any particular regulatory actions that could affect the environment. In order to trigger the NEPA requirement of an EIS, the agency must be prepared to undertake an " 'irreversible and irretrievable commitment of resources' to an action that will affect the environment." *Wyoming Outdoor Council v. U.S. Forest Service,* 165 F.3d 43, 49 (D.C.Cir. 1999) (quoting *Mobil Oil Corp. v. FTC,* 562 F.2d 170, 173 (2d Cir.1977)). Because the FDA's presumption does not bind its decisionmaking authority, it has neither taken nor prepared to take the irreversible action that is necessary to require preparation of an EIS under *Wyoming Outdoor Council. See id.* Evidencing this nonbinding effect is the FDA's 1993 decision to open the labeling issue for further discussion, requesting additional public comment on the possible implementation of a general labeling requirement. 58 Fed. Reg. 25,837 (1993).

■ Moreover, agency decisions that maintain the substantive status quo do not constitute major federal actions under NEPA. *See Fund for Animals, Inc. v. Thomas,* 127 F.3d 80, 84 (D.C.Cir.1997); *Committee for Auto Responsibility v. Solomon,* 603 F.2d 992, 1002–03 (D.C.Cir. 1979). Defendants maintain correctly that their actions have not altered the status quo because "rDNA modified foods ... were regulated no differently before the publication of the Policy Statement than they are now." Def.'s Mot.Summ.J. at 44. Because the announcement of a rebuttable presumption of GRAS does not affect the substantive regulatory status quo, it is not a major federal action. *See Fund for Animals,* 127 F.3d at 84.

■ The Statement of Policy is not only reversible and consistent with the status quo ante; it is also not properly an "agency action." The core of Plaintiff's NEPA claim is that FDA has failed to regulate rDNA-modified foods, and that this failure to act engenders environmental consequences. But NEPA applies only to agency actions, "even if inaction has envi-

ronmental consequences." *Defenders Wildlife v. Andrus,* 627 F.2d 1238, 1243 (D.C.Cir.1980). The *Defenders of Wildlife* court reasoned that Congress did not intend for agencies to perform environmental studies when the agencies were not acting. *See id.* at 1244. In certain cases, agencies may take action by authorizing private action, but in such cases the government still must undertake some overt act, such as issuing a permit or affirming a substance as GRAS. *See id.*

In the instant case, FDA has not taken an overt action, but instead has merely announced a presumption that certain foods do not require special regulation. This presumption against regulation does not constitute an overt action, and is therefore not subject to NEPA requirements. *See Cross–Sound Ferry Services, Inc. v. ICC,* 934 F.2d 327, 334 (D.C.Cir.1991) (upholding I.C.C. finding that "a conclusion that regulation is not necessary is not a federal action, but is simply a determination not to take action," 6 I.C.C.2d 228, 246 (1989)), *abrogated on other grounds by Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).

▮ In sum, because FDA's Statement of Policy is reversible, maintains the substantive status quo, and takes no overt action, the Statement of Policy does not constitute a major federal action under NEPA.[4] FDA was not required to compile an Environmental Assessment or an Environmental Impact Statement in conjunction with the Statement of Policy, and therefore its failure to do so does not violate NEPA.[5]

## D. GRAS Presumption

▮ In their challenge to the FDA's Statement of Policy, Plaintiffs further claim that the Statement of Policy's presumption that rDNA-engineered foods are GRAS violates the GRAS requirements of the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 321(s), and is therefore arbitrary and capricious. *See* Pls.' Mot.Summ.J. at 27; *see also* 5 U.S.C. § 706(2)(A). The FDCA provides that any substance which may "becom[e] a component or otherwise affect[ ] the characteristics of any food" shall be deemed a food additive. *See* 21 U.S.C. § 321(s). A producer of a food additive must submit a food additive petition to FDA for approval unless FDA determines that the additive is "generally recognized [by qualified experts] . . . as having been adequately shown through scientific procedures . . . to be safe under the conditions of its intended use."[6] *Id.*

4. Because the Statement of Policy is not a major federal action, the Court need not to address Defendants' alternative argument that the Statement was covered by a categorical exclusion to NEPA.

5. Plaintiffs have argued that internal FDA documents which contemplate the preparation of an EIS and the agencies' invocation of a categorical exclusion in the Statement of Policy demonstrate that Defendants "have already admitted that the 1992 Policy is subject to NEPA review." Pls.' Mem. in Opp'n to Defs.' Mot. to Dismiss or for Summ.J. ["Pls.' Opp'n"] at 15. These facts do not, however, alter the analysis in this case. If the agency has not taken a major action, then NEPA does not apply regardless of whether FDA considered preparing an EIS or whether it claimed the Statement was covered by a categorical exception.

Plaintiffs have also argued that FDA regulations require the preparation of environmental assessments when the agency affirms a substance as GRAS or approves a food additive provision. *See* Pl.'s Response at 16; 21 C.F.R. § 25.20(i), (k). Yet for the purpose of reviewing Plaintiffs' challenge to the Statement of Policy, the agency has merely established a rebuttable presumption and not finally determined the GRAS status of any food substance.

6. This section provides more extensively that:

The term 'food additive' means any substance the intended use of which results or may result, directly or indirectly, in its becoming a component or otherwise affecting the characteristics of any food (including any substance intended for use in producing, manufacturing, packing, processing, preparing, treating, packaging, transporting, or holding food; and including any source of radiation intended for any such use), if such substance is not generally recognized, among experts qualified by scienti-

In the Statement of Policy, FDA indicated that, under § 321(s),

> it is the intended or expected introduction of a substance into food that makes the substance potentially subject to food additive regulation. Thus, in the case of foods derived from new plant varieties, it is the transferred genetic material and the intended expression product or products that could be subject to food additive regulation, if such material or expression products are not GRAS.

57 Fed.Reg. at 22,990. Accordingly, FDA reasoned that the only substances added to rDNA engineered foods are nucleic acid proteins, generally recognized as not only safe but also necessary for survival. *See id.* ("Nucleic acids are present in the cells of every living organism, including every plant and animal used for food by humans or animals, and do not raise a safety concern as a component of food"). Therefore, FDA concluded that rDNA engineered foods should be presumed to be GRAS unless evidence arises to the contrary. *See id.* at 22,991 ("Ultimately, it is the food producer who is responsible for assuring safety."); *see also* Defs.' Mot.Summ.J. at 18–20. The Statement of Policy does acknowledge, however, that certain genetically modified substances might trigger application of the food additives petitioning process. In that vein, FDA recognized that "the intended expression product in a food could be a protein, carbohydrate, fat or oil, or other substance that differs significantly in structure, function, or composition from substances found currently in food. Such substances may not be GRAS and may require regulation as a food additive." *Id.* at 22,990.

■ This Court's evaluation of the FDA's interpretation of § 321(s) is framed by *Chevron, U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Since " 'statutory interpretation begins with the language of the statute itself,' " *Butler v. West,* 164 F.3d 634, 639 (D.C.Cir.1999) (quoting *Pennsylvania Dep't of Pub. Welfare v. Davenport,* 495 U.S. 552, 557–58, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990)), as a general matter the Court first must determine whether Congress has spoken directly to the issue at hand, a line of analysis that has become known as *Chevron* step one. If, using "traditional tools of statutory construction," *Natural Resources Defense Council, Inc. v. Browner,* 57 F.3d 1122, 1125 (D.C.Cir.1995), the Court answers this inquiry in the affirmative, then "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778.

■ But *Chevron* review also concerns itself with the extent and application of agency discretion in interpreting the statute at issue. In other words, "a reviewing court's inquiry under *Chevron* is rooted in statutory analysis and is focused on discerning the boundaries of Congress' delegation of authority to the agency." *Arent v. Shalala,* 70 F.3d 610, 615 (D.C.Cir.1995). To resolve the issue, "the question for the reviewing court is whether the agency's construction of the statute is faithful to its plain meaning, or, if the statute has no plain meaning, whether the agency's interpretation 'is based on a permissible construction of the statute.' " *Id.* (quoting *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778). If this interpretation is "reasonable and consistent with the statutory scheme and legislative history." *Cleveland v. United States Nuclear Regulatory Comm'n,* 68 F.3d 1361, 1367 (D.C.Cir.1995), then the Court must defer to the agency. This inquiry into the agency's interpretation constitutes *Chevron* step two. *See id.*

fic training and experience to evaluate its safety, as having been adequately shown through scientific procedures (or, in the case as a substance used in food prior to January 1, 1958, through either scientific procedures or experience based on common use in food) to be safe under the conditions of its intended use....

21 U.S.C. § 321(s)

When Congress passed the Food Additives Amendment in 1958, it obviously could not account for the late twentieth-century technologies that would permit the genetic modification of food. The "object and policy" of the food additive amendments, *Mova Pharm. Corp. v. Shalala,* 140 F.3d 1060, 1067 (D.C.Cir.1998), is to "require the processor who wants to add a new and unproven additive to accept the responsibility ... of first proving it to be safe for ingestion by human beings." S.Rep. No. 85–2422, at 2 (1958). The plain language of § 321(s) fosters a broad reading of "food additive" and includes "any substance intended for use in producing, manufacturing, packing, processing, preparing, treating, packaging, transporting, or holding food; and ... any source of radiation intended for any such use." § 321(s).

Nonetheless, the statute exempts from regulation as additives substances that are "generally recognized ... to be safe under the conditions of its intended use...." § 321(s). Plaintiffs have not disputed FDA's claim that nucleic acid proteins are generally recognized to be safe. *See* Pls.' Resp. to Defs.' Stmt. ¶ 1. Plaintiffs have argued, however, that significant disagreement exists among scientific experts as to whether or not nucleic acid proteins are generally recognized to be safe when they are used to alter organisms genetically. Having examined the record in this case, the Court cannot say that FDA's decision to accord genetically modified foods a presumption of GRAS status is arbitrary and capricious. "The rationale for deference is particularly strong when the [agency] is evaluating scientific data within its technical expertise." *International Fabricare Institute v. U.S.E.P.A.,* 972 F.2d 384, 389 (D.C.Cir.1992). "[I]n an area characterized by scientific and technological uncertainty[,] ... this court must proceed with particular caution, avoiding all temptation to direct the agency in a choice between rational alternatives." *Environmental Defense Fund, Inc. v. Costle,* 578 F.2d 337, 339 (D.C.Cir.1978).

■ To be generally recognized as safe, a substance must meet two criteria: (1) it must have technical evidence of safety, usually in published scientific studies, and (2) this technical evidence must be generally known and accepted in the scientific community. *See* 21 C.F.R. § 170.30(a–b); 62 Fed.Reg. 18940. Although unanimity among scientists is not required, "a severe conflict among experts ... precludes a finding of general recognition." 62 Fed.Reg. at 18939. Plaintiffs have produced several documents showing significant disagreements among scientific experts.[7] However, this Court's review is confined to the record before the agency at the time it made its decision. *IMS, P.C. v. Alvarez,* 129 F.3d 618, 623 (D.C.Cir.1997); *Walter O. Boswell Mem'l Hosp. v. Heckler,* 749 F.2d 788, 792 (D.C.Cir.1984) ("If a court is to review an agency's record fairly, it should have before it neither more nor less information than did the agency when it made its decision."). Therefore, the affidavits submitted by Plaintiffs that are not part of the administrative record will not be considered.

■ Nonetheless, Plaintiffs, pointing to the critical comments of lower-level FDA officials insist that even the administrative record reveals a lack of general recognition of safety among qualified experts. *See* Pl's Mot. at 35. However, lower-level

---

**7.** *See* Pls.' Mot. Ex. 2 (Plaintiff scientist affidavit describing dangers of rDNA technology), Ex. 3 (Scientist affidavit describing rDNA technology as "inherently risky"), Ex. 4 (Scientist affidavit describing risks of rDNA technology); Pls.' Reply Ex. 12 (Administrative Record at 18,952–53 [hereinafter AR] ) (FDA scientist comments on the Statement of Policy, noting difference between genetic engineering and cross-breeding); Ex. 13 (AR at 19,179) (FDA scientist criticizing scientific basis of Statement of Policy); Ex. 15 (FDA scientists arguing that pre-market review of genetically engineered foods is necessary); AR at 18,130 (FDA scientist arguing that Food Additives Amendment should be applied to rDNA engineered foods); AR at 18,572 (FDA toxicology group head warning that genetically modified plants could have high levels of toxins).

comments on a regulation "do[ ] not invalidate the agency's subsequent application and interpretation of its own regulation." *San Luis Obispo Mothers for Peace v. U.S. Nuclear Regulatory Comm'n,* 789 F.2d 26, 33 (D.C.Cir.1986). Moreover, pointing to a 44,000 page record, the FDA notes that Plaintiffs have chosen to highlight a selected few comments of FDA employees, which were ultimately addressed in the agency's final Policy Statement. As a result, Plaintiffs have failed to convince the Court that the GRAS presumption is inconsistent with the statutory requirements.

### E. Labeling

█ Plaintiffs have also challenged the Statement of Policy's failure to require labeling for genetically engineered foods, for which FDA relied on the presumption that most genetically modified food ingredients would be GRAS. *See* Pl.'s Mot. at 39. Plaintiffs claim that FDA should have considered the widespread consumer interest in having genetically engineered foods labeled, as well as the special concerns of religious groups and persons with allergies in having these foods labeled. *See* Pl.'s Mot. at 51–54.

The FDCA, 21 U.S.C. § 321(n), grants the FDA limited authority to require labeling. In general, foods shall be deemed misbranded if their labeling "fails to reveal facts ... material with respect to consequences which may result from the use of the article to which the labeling ... relates under the conditions of use prescribed in the labeling ... or under such conditions of use as are customary or usual." 21

U.S.C. § 321(n). Plaintiffs challenge the FDA's interpretation of the term "material." Thus, the question is again one of statutory interpretation. As is apparent from the statutory language, Congress has not squarely addressed whether materiality pertains only to safety concerns or whether it also includes consumer interest. Accordingly, interpretation of the § 321(n)'s broad language is left to the agency. *Cf. Community Nutrition Inst. v. Block,* 749 F.2d 50, 54 (D.C.Cir.1984) ("[T]he relatively unspecific nature of the labeling standard which Congress has prescribed ... suggests that this is an area in which courts must give great deference to the Secretary [of Agriculture]'s judgments.").

█ Because Congress has not spoken directly to the issue, this Court must determine whether the agency's interpretation of the statute is reasonable. *See Chevron,* 467 U.S. at 864, 104 S.Ct. 2778. Agency interpretations receive substantial deference, particularly when the agency is interpreting a statute that it is charged with administering. *See Rust v. Sullivan,* 500 U.S. 173, 184, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). Even if the agency's interpretation is not "the best or most natural by grammatical or other standards," if the interpretation is reasonable, then it is entitled to deference. *Pauley v. BethEnergy Mines, Inc.,* 501 U.S. 680, 702, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991).

The FDA takes the position that no "material change," under § 321(n), has occurred in the rDNA derived foods at issue here. Absent unique risks to consumer health[8] or uniform changes to food derived

8. In other contexts, the FDA has identified that the presence of an increased risk to consumer safety constitutes a "material change." *See e.g.,* 49 Fed.Reg. 13679 (pertaining to FDA requirement in 21 C.F.R. § 101.17(d)(1) that a special warning statement appear on the label of protein products intended for use in weight reduction due to health risks associated with very low calorie diets). Likewise, should a material consequence exist for a particular rDNA-derived food, the FDA has and will require special labeling. *See* Fed. Reg. 22991; AR at 37782–843, 39849–963

(discussing the requirement that laureate canola and high-oleic acid soybean oil have special labeling because they differ in composition and use from the traditional canola and soybean oil.). However, the Policy Statement at issue here provides only a very general rule regarding the *entire class* of rDNA derived foods. Thus, without a determination that, *as a class,* rDNA derived food pose inherent risks or safety consequences to consumers, or differ in some material way from their traditional counterparts, the FDA is without authority to mandate labeling.

through rDNA technology, the FDA does not read § 321(n) to authorize an agency imposed food labeling requirement. More specifically irksome to the Plaintiffs, the FDA does not read § 321(n) to authorize labeling requirements solely because of consumer demand. The FDA's exclusion of consumer interest from the factors which determine whether a change is "material" constitutes a reasonable interpretation of the statute. Moreover, it is doubtful whether the FDA would even have the power under the FDCA to require labeling in a situation where the sole justification for such a requirement is consumer demand. *See Stauber v. Shalala,* 895 F.Supp. 1178, 1193 (W.D.Wis.1995) ("In the absence of evidence of a material difference between [milk from cows treated with a synthetic hormone] and ordinary milk, the use of consumer demand as the rationale for labeling would violate the Food, Drug, and Cosmetic Act.").

■ Plaintiffs fail to understand the limitation on the FDA's power to consider consumer demand when making labeling decisions because they fail to recognize that the determination that a product differs materially from the type of product it purports to be is a factual predicate to the requirement of labeling. Only once materiality has been established may the FDA consider consumer opinion to determine whether a label is required to disclose a material fact. Thus, "if there is a [material] difference, and consumers would likely want to know about the difference, then labeling is appropriate. If, however, the product does not differ in any significant way from what it purports to be, then it would be misbranding to label the product as different, even if consumers misperceived the product as different." *Id.* The FDA has already determined that, in general, rDNA modification does not "materially" alter foods, and as discussed in Section II.E, *supra,* this determination is entitled to deference.[9] Given these facts, the FDA lacks a basis upon which it can legally mandate labeling, regardless of the level of consumer demand.

■ Plaintiffs also contend that the *process*[10] of genetic modification is a "material fact" under § 321(n) which mandates special labeling, implying that there are new risks posed to the consumer. However, the FDA has determined that foods produced through rDNA techniques do not "present any different or greater safety concern than foods developed by traditional plant breeding," and concluded that labeling was not warranted. 57 Fed.Reg. at 22991. That determination, unless irrational, is entitled to deference. *See Pauley v. BethEnergy Mines, Inc.,* 501 U.S. 680, 702, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991). Accordingly, there is little basis upon which this Court could find that the FDA's interpretation of § 321(n) is arbitrary and capricious.

**F. Free Exercise**

■ Plaintiffs have argued that the Statement of Policy unconstitutionally violates their right to free exercise of religion by allowing unlabeled genetically engineered foods on the market. Under the Supreme Court's decision in *Employment Division v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), however, neutral laws of general applicability do not violate the Free Exercise Clause, even if the laws incidentally burden religion. *See id.* at 878. Because it is not disputed that

9. Plaintiffs' implication that this interpretation is not entitled to deference because it represents a change in policy is largely unsupported, and therefore, lacks merit.

10. Disclosure of the conditions or methods of manufacture has long been deemed unnecessary under the law. The Supreme Court reasoned in 1924, "When considered independently of the product, the method of manufacture is not material. The act requires no disclosure concerning it." *U.S. v. Ninety–Five Barrels (More or Less) Alleged Apple Cider Vinegar,* 265 U.S. 438, 445, 44 S.Ct. 529, 68 L.Ed. 1094 (1924) (referring to the Food and Drug Act of June 30, 1906, Pub.L. No. 59–384, 34 Stat. 768, precursor to the FDCA).

the Statement of Policy is neutral and generally applicable, Plaintiff's Free Exercise Claim must fail. *See* Pls.' Mot. at 64 (conceding that the Statement of Policy is neutral and generally applicable).[11]

### G. Religious Freedom Restoration Act

■■■ Plaintiffs also claim that the Statement of Policy burdens their religion in violation of the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb–2000bb–4. *See* Pls.' Mot. at 58. Congress enacted RFRA in reaction to the *Employment Division v. Smith* decision in order to "restore the compelling interest test" for Free Exercise issues. § 2000bb(b). RFRA's definition of the compelling interest test provides that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability ... [unless the rule is] (1) in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." § 2000bb–1(a–b). This test is not to be "construed more stringently or more leniently than it was prior to *Smith.*" H.R.Rep. No. 103–88, at 7 (1993).

Although the Supreme Court has overruled the portions of RFRA applicable to the state governments on the grounds that Congress exceeded its authority under the Fourteenth Amendment, *see City of Boerne v. Flores,* 521 U.S. 507, 536, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), its holding does not affect RFRA's applicability to the federal government. *Cf. Alaska Airlines v. Brock,* 480 U.S. 678, 684, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987) ("A court should refrain from invalidating more of the statute than is necessary ...."). Before *Boerne,* this Circuit held that Congress had the authority to enact RFRA as to federal law. *See EEOC v. Catholic Univ. of Am.,* 83 F.3d 455, 470 (D.C.Cir. 1996). While this Circuit has not squarely addressed the constitutionality of RFRA as applied to the federal government since

*Boerne,* several decisions in this and other circuits support the continuing validity of *Catholic University* 's holding that RFRA applies to the federal government. *See Alamo v. Clay,* 137 F.3d 1366, 1368 (D.C.Cir.1998) (assuming without deciding that RFRA applies to the federal government); *In re Young,* 141 F.3d 854, 863 (8th Cir.1998), *cert. denied,* 525 U.S. 811, 119 S.Ct. 43, 142 L.Ed.2d 34 (1998) (holding the portion of RFRA applicable to federal law constitutional); *see also Branch Ministries v. Rossotti,* 40 F.Supp.2d 15, 24 n. 6 (D.D.C.1999) (applying RFRA after federal government conceded RFRA's constitutionality as applied to it.)

■■■ Defendants concede that RFRA applies to the FDA. *See* Def.'s Mot. at 42. Assuming arguendo that Plaintiffs' meet the RFRA requirement that their beliefs are sincerely held and can demonstrate an "honest conviction" desiring to avoid genetically engineered foods, *see Thomas v. Review Board, Indiana Employment Sec. Div.,* 450 U.S. 707, 715–16, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981), Plaintiffs still must establish that Defendants have substantially burdened Plaintiffs' religion. *See* 42 U.S.C. § 2000bb–1(b). A substantial burden does not arise merely because "the government refuses to conduct its own affairs in ways that comport with the religious beliefs of particular citizens." *See Bowen v. Roy* 476 U.S. 693, 699, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986). The Free Exercise Clause (as interpreted before *Smith* and incorporated into RFRA) does not require the government to take action to further the practice of individuals' religion. *See id.* Indeed, were the government to take such action, it might bring itself precariously close to violating the First Amendment's Establishment Clause.

Arguing that the government does have some obligation to facilitate the practice of religion, Plaintiffs point to several cases involving prisoners, in which the govern-

---

11. Plaintiffs' claim that the Statement of Policy nevertheless violates the Free Exercise

Clause because it lacks a rational basis is without merit.

ment was required to provide nutritional information and alternative diets for inmates whose religious beliefs required dietary restrictions. *See* Pl.'s Reply at 44; *Barnett v. Rodgers,* 410 F.2d 995, 999 (D.C.Cir.1969) (rejecting the government's contention that Muslim inmates could practice their religion by simply not eating foods they found objectionable and held that the government was required to disclose the pork content of meals and make at least one pork-free meal a day available). However, the prisoner cases cited by the Plaintiffs are inapposite to the issue before this Court. In this case, the Plaintiffs' liberty is not restricted and they are free to choose their food and may obtain their food from the source of their choosing.

Still, Plaintiffs argue that in the absence of labeling they are unable to know whether the foods they consume are genetically engineered or not. *See* Pls.' Reply at 44–45. While the Court recognizes the potential inconvenience the lack of labeling presents for Plaintiffs, Defendant's decision to mandate labeling of genetically modified foods does not "substantially" burden Plaintiffs' religious beliefs. Furthermore, given that the FDA functions under statutory power granted by Congress and cannot exceed that power, Plaintiffs' argument on this point is probably better directed at Congress, than at the Defendant or this Court.[12] The Policy Statement does not place "substantial pressure" on any of the Plaintiffs, nor does it force them to abandon their religious beliefs or practices. *See Branch Ministries v. Rossotti,* 40 F.Supp.2d 15 (D.D.C.1999) (citing *Thomas v. Review Bd. of Indiana Employment Sec. Div.,* 450 U.S. 707, 718, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) and *Sherbert v. Verner,* 374 U.S. 398, 404, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)). Accordingly, Plaintiffs are not entitled to relief under \*\*\* RFRA.

**12.** On November 16, 1999, the Genetically Engineered Food Right To Know Act was introduced in the House of Representatives. The bill proposed amending FDCA, the Federal Meat Inspection Act, and the Poultry Prod-

### CONCLUSION

For the foregoing reasons, the Court determines that Defendant's 1992 Policy Statement did not violate the Administrative Procedures Act, the National Environmental Policy Act, or the procedures mandated by the FDCA and FDA regulations. Furthermore, Defendant was not arbitrary and capricious in its finding that genetically modified foods need not be labeled because they do not differ "materially" from non-modified foods under 21 U.S.C. § 321(n). Finally, the Court finds that Defendant's Policy Statement does not violate the First Amendment Free Exercise Clause or RFRA, 42 U.S.C. § 2000bb–1(b). Hence, the Court denies Plaintiffs' motion for summary judgment and grants Defendant's motion for same. An appropriate order accompanies this memorandum opinion.

ucts Inspection Act to require that food that contains a genetically engineered material, or that is produced with a genetically engineered material, be labeled accordingly. *See* H.R. 3377, 106th Cong. (1999).