On Application for Rehearing
The opinion of this court issued on October 18, 2001, is withdrawn, and the following is substituted therefor.
Families Concerned About Nerve Gas Incineration ("Families") and Serving Alabama's Future Environment, Inc. ("SAFE") (hereinafter sometimes referred to jointly as "Families"), appeal from a judgment of the Montgomery Circuit Court affirming a decision by the Alabama Environmental Management Commission ("the Commission") upholding the issuance of hazardous-waste-incineration permits by the Alabama Department of Environmental Management ("ADEM").
On June 19, 1997, ADEM issued hazardous-waste facility permits to the United States Department of the Army, Anniston Army Depot; the United States Department of the Army, program manager for chemical demilitarization; and Westinghouse Electric Corporation. The permits authorize the permittees to incinerate chemical weapons, including mustard gas, the nerve agent Sarin (GB), and the nerve agent VX, all stored at the Anniston Army Depot. Families and SAFE are public-interest citizen groups with members from Calhoun County and other locations in the State organized to ensure that the incineration of the chemical agents at Anniston Army Depot is accomplished in a manner that protects human health, safety, and the environment. On July 2, 1997, Families filed with the Commission an administrative challenge to the issuance of the permits. The Commission appointed a hearing officer, who presided over a hearing that included five weeks of testimony and the receipt of voluminous documentary evidence during a three-year period.
On April 20, 2000, the hearing officer presented the Commission with extensive findings of fact, conclusions of law, and a recommendation that the Commission approve the issuance of the permits, without modification. On June 20, 2000, the Commission adopted the hearing officer's findings, conclusions, and recommendations in their entirety. On July 19, Families appealed the Commission's decision to the Montgomery Circuit Court, which affirmed the Commission's order on January 19, 2001. On March 5, 2001, Families appealed to this court, arguing two procedural issues: (1) that the permits were issued pursuant to an invalid "rule," in violation of the Alabama Administrative Procedure Act ("Alabama APA"); and (2) that ADEM had failed to comply with ADEM Rule335-14-5-.04, which requires permittees to have a contingency plan "designed to eliminate the hazards to human health or the environment from fires, explosions, or unplanned . . . release of hazardous waste . . . constituents to air, soil or surface water."
 Background
In 1994, the United States and 144 other nations signed the Chemical Weapons Convention, which requires the signatory nations to destroy their chemical-weapon stockpiles. See Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on their Destruction, August 8, 1994, art. IV, para. 6, 32 I.L.M. 800 (entered into force April 29, 1997). Congress directed the Army to destroy its stockpile of chemical *Page 861 
weapons by April 29, 2007. See 50 U.S.C. § 1521(b)(5) and S.Res. 75, 105th Cong., 143 Cong. Rec. 3651 (1997) (enacted). The United States' arsenal of chemical weapons as originally located at Johnson Atoll in the Pacific Ocean and at eight different sites in the continental United States.[1] One of those sites is the Anniston Army Depot, where 4.5 million pounds of chemical weapons — approximately 7% of the nation's stockpile — are currently stored.
Section 22-30-12(c), Ala. Code 1975, requires each hazardous-waste permit issued by ADEM to "contain such terms and conditions as the director determines [are] necessary to protect human health or the environment." That statutory directive is taken directly from42 U.S.C. § 6925(c), a part of the Federal Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 et seq. ("RCRA"), which governs the storage, treatment, and disposal of hazardous wastes. Pursuant to the RCRA, the Environmental Protection Agency ("EPA") promulgates regulations and establishes national standards for the management of hazardous wastes. See 42 U.S.C. § 6911, 6912, 6921-25, and 40 C.F.R. § 270.11. The RCRA provides that states may administer and enforce their own hazardous-waste programs, see 42 U.S.C. § 6926, and may carry out such programs "in lieu of the federal program," see42 U.S.C. § 6926(b), if state program requirements are at least as stringent as the federal requirements, see 40 C.F.R. § 271. By enacting the Alabama Hazardous Wastes Management and Minimization Act, § 22-30-1 et seq., Ala. Code 1975, the Alabama Legislature intended "that [ADEM] seek and retain authorization to operate the State Hazardous Waste Management Program" and had as a goal "to achieve consistency with the [corresponding] Federal [program]." See § 22-30-2, Ala. Code 1975. Pursuant to the statutory mandate of § 22-30-12(c), requiring hazardous-waste permits to "contain such terms and conditions as the director determines [are] necessary to protect human health or the environment," ADEM required the permittees to submit a contingency plan "designed to eliminate the hazards to human health or the environment from fires, explosions, or unplanned . . . release of hazardous waste . . . constituents to air, soil or surface water." Pursuant to the same statutory mandate, ADEM required as a "term or condition of the permit[s]" issued in this case that the emissions from the incineration of the chemical weapons not exceed an "excess-lifetime-cancer-risk factor" of 1 x 10-5.
The cancer-risk factor expressed in exponential terms means that, as a worst-case scenario, one in 100,000 persons who have been exposed to emissions from the chemical-weapons-incineration process, and who would not otherwise have developed cancer, will develop cancer as a result of the exposure. The cancer-risk factor is also known as a "screening risk assessment." See Sierra Club v. Utah Solid Hazardous Waste ControlBd., 964 P.2d 335 (Utah Ct.App. 1998). The function of a "screening risk assessment" has been explained as follows:
 "[T]he purpose of a screening risk assessment is to `provide a conservative estimate of the possible risk of health hazards posed by chemical emissions from a facility'. . . . `[C]onservative' means the assessment includes `numerous assumptions or calculation procedures that result in a broad margin of safety between the calculated risk estimate . . . and the likely risk to human health.' In other words, the assessment makes assumptions that `intentionally overstat[e] what is known to be true.' *Page 862 
Because of this broad safety margin, it is not appropriate to interpret the assessment's risk estimates as `true' or `absolute.' Instead, a screening risk assessment `is a method for determining plausible upper limits of risk, not actual probability or risk of harm.'"
Sierra Club, 964 P.2d at 341 (emphasis added). The 10-5 standard was derived from an EPA document, or "guidance," issued in 1993 and revised in 1994. The EPA document is entitled "Implementation Guidance for Conducting Indirect Exposure Analysis at RCRA Combustion Units." Under a "Notice" on the first page of the document, the guidance states:
 "The recommendations set out in this document are not final Agency action, but are intended solely as guidance. They are not intended, nor can they be relied upon, to create any rights enforceable by any party in litigation with the United States. EPA officials may decide to follow the guidance provided in this memorandum, or to act at variance with the guidance, based on an analysis of specific site circumstances. The Agency also reserves the right to change this guidance."
 I.
Families contends that the cancer-risk factor used to delineate the terms and conditions of the permit is a legislative "rule," subject to the formal notice-and-comment provisions of § 41-22-4 through -7, Ala. Code 1975. It maintains that because the 10-5 standard was not adopted in compliance with formal rulemaking procedures the standard is an invalid rule that, it says, voids the agency action — in this case, the issuance of the permit.
ADEM responds by arguing that the 10-5 standard is not a "rule"; instead, ADEM says, it is a "statement of policy . . . made in [a] contested case." It is undisputed that a licensing or permit proceeding is a "contested case." See § 41-22-3(3), Ala. Code 1975 (stating that a "contested case" is "[a] proceeding, including . . . licensing, in which the legal rights, duties, or privileges of a party are required by law to be determined by an agency after an opportunity for hearing").
Section 41-22-3(9), Ala. Code 1975, defines "rule." That section states, in pertinent part:
 "RULE. Each agency regulation, standard, or statement of general applicability that implements, interprets, or prescribes law or policy. . . . The term includes the amendment or repeal of all existing rules, but does not include any of the following:
". . . .
 "d. Determinations, decisions, orders, statements of policy, and interpretations that are made in contested cases."
We begin our analysis of whether the cancer-risk factor contained in the "EPA Guidance" is a "rule" by looking at six Alabama decisions that have construed § 41-22-3(9). See Alabama Dep't of Transp. v. BlueRidge Sand Gravel, Inc., 718 So.2d 27 (Ala. 1998); Brunson Constr. Envtl. Servs., Inc. v. City of Prichard, 664 So.2d 885 (Ala. 1995); Exparte Traylor Nursing Home, Inc., 543 So.2d 1179 (Ala. 1988); HartfordHealthcare, Inc. v. Williams, 751 So.2d 16 (Ala.Civ.App. 1999);Montgomery Rehab. Hosp., Inc. v. State Health Planning Agency,610 So.2d 403, 406 (Ala.Civ.App. 1992); and Potts v. Bennett, 487 So.2d 919
(Ala.Civ.App. 1985).
In Alabama Department of Transportation v. Blue Ridge Sand Gravel,Inc., our supreme court held that a specification requiring that gravel used in road asphalt have a certain specific gravity was not a rule within the meaning of § 41-22-3(9), *Page 863 
but was "simply a term that may be incorporated into a contract between the Department and some other party." 718 So.2d at 29. ADEM argues that the specification at issue in Blue Ridge is analogous to the cancer-risk factor at issue here because the cancer-risk factor is a "term or condition" incorporated into the hazardous-waste permit. Although the two cases do share a superficial similarity, the "term or condition" at issue in Blue Ridge is unlike the cancer-risk factor at issue here because the Blue Ridge specification was objective, was required as a condition of the State's receiving federal highway funds, and called for little or no discretionary policy-making. In contrast, the 10-5 cancer-risk "term or condition" is intrinsically
a matter of discretionary policy-making. It answers the policy question, "What level of safety to human health will be demanded in regulating emissions from the incineration of chemical weapons?" Based on BlueRidge, a strong argument can be made that the cancer-risk factor is a rule pursuant to § 41-22-3(9) because it "implements . . . or prescribes policy."
In Brunson Construction Environmental Services, Inc. v. City ofPrichard, the Alabama Supreme Court held that ADEM was required to use formal rulemaking to establish the method by which it calculates a landfill's daily permitted volume. Families argues that Brunson stands for the proposition that when a permit contains a "term or condition" premised on a standard that has not undergone agency rulemaking, the standard — and therefore the permit incorporating the standard — is invalid. Although that argument seems compelling, the "standard" at issue in Brunson is very different from the "standard" at issue in this present case. In Brunson, the volume-limit for state landfills necessarily applied across-the-board, regardless of population density, topography, or meteorological conditions, and it affected future landfill permit applications. In contrast, the health standard for emissions from a chemical-weapons incinerator is sui generis. There are
no other chemical-weapon disposal sites in the State and, once the munitions stored at the Anniston Army Depot are disposed of, the cancer-risk factor incorporated into these permits is unlikely to apply to other permit applications. Stated in terms of § 41-22-3(9), the 10-5 standard is not one of "general applicability." Cf. LimerickEcology Action, Inc. v. United States Nuclear Regulatory Comm'n,869 F.2d 719 (3d Cir. 1989) (holding that, in determining the accident risk for a nuclear generating station, neither the severity of the consequences nor the likelihood of the occurrence of an accident is subject to a generic, across-the-board assessment; each determination must be site-specific).
In Ex parte Traylor Nursing Home, Inc., our supreme court held that an amendment to the State Health Plan authorizing hospitals to use up to 10 "swing beds" — beds that could be used for either skilled nursing home patients or hospital patients — was a standard of general applicability to all hospitals and, therefore, was subject to formal notice-and-comment rulemaking. The court explained that, to be a §41-22-3(9) "rule," a requirement must be couched in binding, mandatory terms ("must" and "require") and must concern a matter of "general applicability." 543 So.2d at 1183-84.
Applying those criteria to the present case indicates that the cancer-risk factor is not a "rule." Although it is not determinative, an agency's characterization of its own standard as nonbinding is persuasive and deserves some weight. See Alliance for Bio-Integrity v. Shalala,116 F. Supp.2d 166, 171-72 (D.D.C. 2000). "The ultimate issue is the agency's intent to be bound by its announced standard." See *Page 864 Public Citizen v. United States Nuclear Regulator Comm'n,940 F.2d 679, 682 (D.C. Cir. 1991). Here, the EPA Guidance from which the 10-5 standard was derived states that the standard cannot be relied on to create enforceable rights, that it is not binding, and that it is subject to change.
In Hartford Healthcare, Inc. v. Williams, this court held that Medicaid's reversal of its position on the application of a rule pertaining to payment of direct-patient-care cost-incentives to terminating health-care providers was a "rule" within the meaning of41-22-3(9). In the present case, there has been no reversal, amendment, or repeal of a former position taken by EPA or ADEM. In fact, the record establishes that ADEM has used the 10-5 standard for other hazardous-waste permits, and that EPA has used a range of cancer-risk factors, from 1 x 10-4 (1 in 10,000) to 10-6 (1 in a million) to satisfy its statutory duty to protect "human health and the environment."Hartford Healthcare provides little or no guidance regarding whether the standard at issue here is subject to rulemaking.
In Montgomery Rehabilitation Hospital, Inc. v. State Health PlanningAgency, this court held that a revision of a State Health Plan rehabilitation rule, allowing for 26 new physical rehabilitation beds in the Dothan area, was not a "rule" within the meaning of § 41-22-3(9) because it applied to only one geographical area and was not, therefore, a "statement of general applicability." Like the holding of Brunson, the holding of Montgomery Rehabilitation Hospital indicates that the standard at issue here is not subject to rulemaking because it is not one of general applicability.
In Potts v. Bennett, this court held that the reason given for denying a liquor license — that the applicant's place of business was near a school or a church — was not required to be the subject of rulemaking. Noting that a liquor-license proceeding is a "contested case" and that "interpretations" and "statements of policy" made in a contested case fall within an exception to rulemaking, the court stated, "[W]e cannot accept the argument that all licensing criteria and policy must be made through formal rulemaking procedures." 487 So.2d at 921. The court continued:
 "In federal administrative procedure it has been recognized that an administrative agency is not precluded from announcing new principles in an adjudicatory proceeding. NLRB v. Bell Aerospace Co., 416 U.S. 267 (1974). These adjudicatory or contested case proceedings can and do serve as vehicles for the formulation of agency policies applied and announced therein. NLRB v. Wyman-Gordon Co., 394 U.S. 759
(1969). The choice between formal rulemaking and ad hoc litigation is left, in large part, to the informed discretion of the administrative agency. SEC v. Chenery Corp., 332 U.S. 194 (1947)."
Id. Potts implies that site-specific criteria akin to "policy judgments" made in a contested case are exempt from rulemaking. Because the cancer-risk factor expresses a policy judgment made in a contested case,Potts does not support Families' argument that the 10-5 standard was subject to rulemaking.
Families argues that the 10-5 cancer-risk factor was not a "determination, decision, order, statement of policy or interpretation . . . made in a contested *Page 865 
case" because, it says, ADEM had previously used the same cancer-risk factor in other hazardous-waste permit cases. In other words, Families contends that in order to have been "made in a contested case," a statement of policy must have been announced for thefirst time in that contested case. We disagree. Potts states that the administrative agency had long used "improper location" (near a school or a church) and "community standards" as grounds for denying an application for an off-premises beer license. Potts v. Bennett, 487 So.2d at 919, 921. See also In re Ash Grove Cement Co., 7 E.A.D. 387 (E.P.A. 1997) (stating that "the Combustion Strategy's status as Agency policy does not invalidate either the risk assessment or the permit decisions founded on the risk assessment. . . . [P]olicy and guidance have a legitimate role in the permitting process . . . [and] may be `followed if appropriate in the circumstances of the individual permit'") (quoting In re AlliedSignal, Inc. (Frankford Plant), 4 E.A.D. 748, 760 (E.A.B. 1993)).
An analysis of our precedents indicates that there is no clear answer as to whether the 10-5 standard in the EPA Guidance is a "rule" within the meaning of § 41-22-3(9), and is, therefore, subject to rulemaking. The Commentary to § 41-22-3(9) states that subsection (9) is derived from the Georgia and the Iowa administrative procedure acts. The definition of "rule" found in Ga. Code Ann. § 50-13-2(6) (1975) is in all relevant particulars almost identical to the definition in § 40-22-3(9). Section 50-13-2(6) provides:
 "`Rule' means each agency regulation, standard, or statement of general applicability that implements, interprets, or prescribes law or policy or describes the organization, procedure, or practice requirements of any agency. The term includes the amendment or repeal of a prior rule but does not include the following:
". . . .
 "(D) Statements of policy or interpretations that are made in the decision of a contested case."
Section 17A.2(11) of the Iowa Code defines "rule" as follows:
 "`Rule' means each agency statement of general applicability that implements, interprets, or prescribes law or policy, or that describes the organization, procedure, or practice requirements of any agency. . . . The term includes the amendment or repeal of an existing rule, but does not include:
". . . .
 "d. A determination, decision, or order in a contested case."
Both Georgia and Iowa, whose definitional statutes are the source of § 41-22-3(9), have taken a different approach to deciding whether an agency standard is a "rule" subject to notice-and-comment rulemaking than has Alabama. The Alabama decisions tend to analyze the facial content of an agency statement and then to pigeonhole the statement either into the § 41-22-3(9) definition or into a § 41-22-3(9)a. through d. exception to the definition — without discussing the purpose or effect of the agency statement. On the other hand, the Georgia and Iowa decisions tend to analyze an agency statement not only in terms of its facial content, but also in terms of its intent, purpose, and legal and practical effect. See, e.g., Rielli v. State, 174 Ga. App. 220,330 S.E.2d 104 (1985); Georgia State Bd. of Dental Exam'rs v. Daniels,137 Ga. App. 706, 224 S.E.2d 820 (1976); Barker v. Iowa Dep't ofTransp., 431 N.W.2d 348 (Iowa 1988); Young Plumbing Heating Co. v. IowaNatural Res. Council, 276 N.W.2d 377, 382 (Iowa 1979).
In Rielli v. State, the Georgia court held that a Department of Public Safety regulation directing an arresting officer to write the name of the person performing a chemical test for intoxication on the traffic-citation form was a "mere policy statement which lacks the force and effect of law." *Page 866 174 Ga. App. at 222, 330 S.E.2d at 106. In Daniels, the Georgia court distinguished legislative rules subject to notice-and-comment rulemaking from "interpretive rules" or "general statements of policy," not subject to rulemaking. 137 Ga. App. at 709, 224 S.E.2d at 822. The court held that a legal opinion by counsel for the Board of Dental Examiners was an "interpretive rule." Id.
In Barker v. Iowa Department of Transportation, the Iowa Supreme Court struck down a rule relating to the "margin of error" for calculating the alcohol content of a driver's blood, breath, or urine because the Department had not formally promulgated the "margin of error" as a "rule." What is significant about that case for present purposes is the following comment by the Iowa Administrative Rules Committee, quoted by the court:
 "If the department wishes to establish a margin of error as a matter of opinion, it may do so by an `interpretive' rule. This type of rule does not need specific statutory authority, but it is not law; such a rule . . . in no way is binding upon a court. The interpretive rules are entitled to `respectful consideration' by a court, but the court is entitled to substitute its own opinion for that of the agency."
431 N.W.2d at 350.
In Young Plumbing Heating Co., the Iowa Natural Resources Council relied on a proposed-but-not-yet-adopted legislative rule to deny a permit for the construction of a building on a flood plain. Citing § 17A.3(2) of the Iowa Administrative Procedure Act, which provided that "no agency rule is valid . . . against any party for any purpose until the adoption requirements have been met," the permit applicants argued that reliance on an unpromulgated rule was the equivalent of invoking an invalid rule. The Supreme Court of Iowa rejected the applicants' argument, holding that an agency standard that forms the basis for a "determination, decision, or order in a contested case" need not undergo rulemaking if the standard is relevant to the facts of the contested case and if the standard is not designed to have binding future effect. The court explained:
 "The essential feature is that the content of the proposed rule is being applied to the particular facts as a relevant factor, and not as a valid rule with the force and effect of law."
276 N.W.2d at 382-83. In effect, the Young Plumbing Heating Co. court embraced the notion of an "interpretive rule" — an agency standard that is relevant but nonbinding.
The distinction between "legislative" rules and "interpretive" rules drawn by the Georgia and Iowa courts accords with a similar distinction under the Federal Administrative Procedure Act. Pursuant to5 U.S.C. § 553 (b)(3)(A), rulemaking does not apply to "interpretive rules" or "general statements of policy." See Shalala v. Guernsey Mem'lHosp., 514 U.S. 87 (1995) (holding that the Secretary of Health and Human Services was not required to follow notice-and-comment rulemaking in issuing a Medicare reimbursement "guideline" because the guideline was an interpretive rule); Martin v. Occupational Safety Health ReviewComm'n, 499 U.S. 144, 157 (1991) (noting that administrative agencies typically make authoritative statements of policy through interpretive rules or enforcement guidelines).
Families cites Simpson Tacoma Kraft Co. v. Department of Ecology,119 Wn.2d 640, 835 P.2d 1030 (1992), for the proposition that when an administrative agency relies on federal guidance for a numeric standard without going through a *Page 867 
rulemaking procedure, the standard is invalid. We find SimpsonTacoma Kraft unpersuasive for two reasons. First, unlike the Alabama statute defining "rule," see § 41-22-3(9), Ala. Code 1975, the relevant Washington statute defines "rule" in terms of the consequences of violating an agency-imposed requirement. Section34.05.010(15), Wash. Rev. Code, provides that a "rule" is "any agency order, directive, or regulation of general applicability . . . the violation of which subjects a person to a penalty or administrative sanction." Simpson Tacoma Kraft, 119 Wn.2d at 647,835 P.2d at 1034. If the permittees in this case violate a term or condition of their permits to incinerate the chemical waste, they may incur a penalty pursuant to § 22-30-19(a) and (e)(6), Ala. Code 1975, but the threat of that penalty does not convert the term or condition of their permits into a "rule." Section 22-30-19(a), Ala. Code 1975, states that ADEM may take corrective or punitive action
 "[w]henever, on the basis of any information, the department determines that any person is in violation of any requirement of this chapter, any rule or regulation promulgated by the department or any permit issued under authority granted by this chapter."
(Emphasis added.)
Second, we believe that Simpson Tacoma Kraft, a 1992 Washington decision, has been undercut or modified by a later decision of the Washington Supreme Court. See Budget Rent A Car Corp. v. State Dep't ofLicensing, 144 Wn.2d 889, 31 P.3d 1174 (2001). In Budget, the Washington Department of Licensing determined that a rental car company had incorrectly calculated the size of its rental fleet and that the company owed back taxes and fees. The rental car company challenged the Department's tax assessment on the ground that the manner in which the Department had determined the number of vehicles in the company's fleet was improperly adopted through adjudication rather than through rulemaking, in violation of the Washington APA. The Washington Supreme Court held that the Department had not created a "rule" by establishing a manner of calculation called the "total purchases" formula. Instead, the court determined, the Department had "simply stat[ed] its interpretation of the statutory phrase `total number of passenger cars in the fleet.'"144 Wn.2d at 896, 31 P.3d at 1178.
Likewise, in this case, ADEM did not create a "rule" by relying on an EPA Guidance document that incorporated a cancer-risk factor of 10-5. ADEM merely interpreted the statutory directive of § 22-30-12(c) (requiring that the hazardous-waste permits "contain such terms and conditions as the director determines [are] necessary to protect human health or the environment") in light of the EPA Guidance. We agree with the following statement by the Washington court in Budget:
 "In deciding this case, we are not unmindful of the consequences were we to adopt a very broad interpretation of `rule' (in line with Budget's argument), and the fact that it would all but eliminate the ability of agencies to act in any manner during the course of an adjudication. The simplest and most rudimentary interpretation of a statute or regulation would require an agency to go through formal rule making procedures. While it is true that the APA is designed to provide `greater public and legislative access to administrative decision making,' we believe it is equally true that the APA's provisions were not designed to serve as the of administrative action."
144 Wn.2d at 898, 31 P.3d at 1178 (citation omitted). See also Town ofBrookline v. Commissioner of Dep't of Envtl. Quality Eng'g, 398 Mass. 404,497 N.E.2d 9 (1986) *Page 868 
(upholding an "excess cancers risk assessment" of 99 deaths in an exposed population of 10,000, the court held that an administrative agency had the authority to determine the magnitude of risk of human lung cancer from diesel emissions by means of a rulemaking proceeding or by means of a contested-case adjudicatory proceeding).
Like the Washington Supreme Court, we also recognize that the Alabama APA is designed to ensure that members of the public can participate meaningfully in the development of agency policies that affect them. However, we believe that Alabama's Hazardous Wastes Management and Minimization Act and the ADEM regulations promulgated thereunder account for the interest in providing public access and participation. See §22-30-12(g), Ala. Code 1975, and Ala. Admin. Code R. 335-14-8-.08. Section 22-30-12(g) provides:
 "Before issuance of any permit for a hazardous waste treatment, storage or disposal facility, the department shall give notice of the application therefor to the local governing bodies having jurisdiction over the facility and the citizens of the county in which the facility is to be located, receive public comment, and may, where significant interest is expressed or on its own initiative, hold a public hearing on the application."
Ala. Admin. Code R. 335-14-8-.08 (which is reproduced in full in Appendix A to this opinion) states comprehensive requirements for providing public notice of, and comment upon, hazardous-waste permit proceedings. Thus, despite the absence of formal notice-and-comment rulemaking procedures in this case, the public-participation interests underlying the rulemaking process were not ignored during the process of granting the permits at issue here.
Although we find Simpson Tacoma Kraft distinguishable, we acknowledge that Families has cited other authorities in support of its position that the 10-5 standard should have been promulgated by rule. We simply find the reasoning of the contrary authorities more compelling. In Maple LeafFarms, Inc. v. State Department of Natural Resources, 247 Wisc.2d 96,633 N.W.2d 720 (Wisc. Ct. App. 2001), the court rejected the argument that "all permit language must be formally promulgated by rule."247 Wisc.2d at 112, 633 N.W.2d at 729. The court continued:
 "Carrying this logic further would result in a situation where permit writers could include in permits only restatements of the precise language contained in the administrative code. This would make the issuance of permits an untimely, cumbersome and inflexible exercise that would not benefit permit holders at all. It makes more sense that the legislature would allow the DNR [Department of Natural Resources] flexibility in drafting conditions in permits. This allows the DNR to work individually with permit holders to fashion permits that more closely balance the specific needs of the permit holder with public environmental concerns."
Id.
Based on the fact that Alabama caselaw construing § 41-22-3(9) provides no clear answer to the question whether the 10-5 standard derived from the EPA Guidance is a legislative rule required to have been promulgated by notice-and-comment rulemaking, we turn for guidance to the approach taken by our sister states of Georgia and Iowa — the jurisdictions from which Alabama derived the definition (and the exclusions from the definition) of a legislative "rule." Based on general principles to be gleaned from the Alabama cases, supplemented by the Georgia and Iowa authorities discussing "interpretive rules," and fortified, to *Page 869 
some extent, by federal authorities construing the Federal Administrative Procedure Act provision excluding "interpretive rules" and "policy statements" from rulemaking, we hold that the 10-5 cancer-risk factor was an interpretive rule or a "statement of policy" issued in a contested case and was not, therefore, subject to rulemaking.
First, and most important, we conclude that the cancer-risk factor is not a legislative rule because it does not establish a binding norm under which all future chemical-incineration permits are to be judged. The EPA Guidance from which the 10-5 standard was derived states that the standard cannot be relied on to create enforceable rights, that it is not binding, and that it is subject to change. "The touchstone of a [legislative] rule is that it establishes a binding norm. [However,] [i]f the agency `remains free to consider the individual facts in the various cases that arise, then the agency action in question has not established a binding norm.'" Center for Marine Conservation v. Brown,917 F. Supp. 1128, 1151 (S.D.Tex. 1996) (quoting Professionals Patientsfor Customized Care v. Shalala, 56 F.3d 592, 596-97 (5th Cir. 1995)) (quoting, in turn, Ryder Truck Lines, Inc. v. United States, 716 F.2d 1369,1377 (11th Cir. 1983), cert. denied, 466 U.S. 927 (1984)). The record before us establishes that, in calculating the risk to human health or the environment from the incineration of chemical weapons, ADEM has reserved some "free[dom] to consider the individual facts in the various cases that arise" and to revise the cancer-risk factor contained in the EPA Guidance accordingly. At a January 1998 hearing on Families' challenge to the issuance of the permit, Gerald Hardy, then chief of ADEM's hazardous wastes branch, testified as follows:
 "[A]s I've stated repeatedly — several times. I won't say repeatedly — the risk assessment protocol was fixed or frozen at a point in time. The risk assessment was performed based on the guidance and data available when that protocol was frozen and approved. . . . [However,] we will factor in or take into account new and updated guidance when the risk assessment is re-performed prior to the facility being allowed to commence operation.
". . . .
 "HEARING OFFICER: Before we leave this point, I want to ask you, if I could, please, sir, are you saying that this risk assessment to be reaccomplished is still to be done?
 "THE WITNESS: We recognize that, as I stated earlier, guidance was developing and ongoing. The requirement to do this was only an edict that came out in May of '93. We were trying to process this application and factor that in '94 and early '95. We [were] . . . trying to hit a moving target. We had to say we make a decision we're going to freeze the guidance and data available so that a risk assessment could be performed based on that information. To take into account new data that was gathered, new guidance that was issued, we put in a permit condition that prior to the facility being allowed to start operations, . . . a risk assessment would be re-performed and resubmitted to the department a hundred and eighty days prior to that date.
 "HEARING OFFICER: So that event is somewhere out in the future; is that correct?
 "THE WITNESS: Correct. And it's supposed to reflect the guidance that is current and data that is current at that time."
We note that the use of the EPA Guidance in assessing the risk of chemical-weapon *Page 870 
incineration has been criticized by one commentator who believes that "improvements to the current risk-assessment methodology should be made." See Lawrence V. Tannenbaum, Risk Assessments forChemical Stockpile Incinerators: Is the Supporting Guidance Adequate? 11 Risk: Health, Safety Env't 267, 285 (2000). Tannenbaum states that
 "[g]iven the approaching Chemical Weapons Convention deadline for destruction of the entire chemical stockpile, it would be prudent to ensure that the current guidance is not enforced verbatim for the [chemical stockpile incineration] case."
Id. at 286. Tannenbaum concludes:
 "Where there are opportunities for introducing improvements to the guidance, these should proceed in a site-specific manner."
Id. (Emphasis added.) The record before us indicates that ADEM does not intend to rigidly enforce the risk-assessment methodology set out in the EPA Guidance. We think that, by requiring the permittees to submit a "risk assessment addendum" at three points in the process — before commencing incineration operations, before the start of a "shakedown" period, and after the first "trial burn" — ADEM has indicated its intent to proceed in a "site-specific manner."[2] Cf. Limerick EcologyAction, Inc. v. United States Nuclear Regulatory Comm'n, supra (holding that, in determining the accident risk for a nuclear generating station, neither the severity of the consequences nor the likelihood of the occurrence of an accident is subject to a generic, across-the-board assessment; each determination must be site-specific).
Next, we conclude that the 10-5 cancer-risk factor is not a legislative rule subject to notice-and-comment rulemaking because, by definition, it cannot — and for safety reasons, should not — qualify as a statement of "general applicability." As we have already discussed, chemical-weapon incineration is sui generis in Alabama. Destruction of these weapons pursuant to treaty presupposes that they will be eradicated from the military arsenals of the signatory nations. The record indicates that the 10-5 standard is based on cutting-edge scientific knowledge that is continually being updated. The record demonstrates that, in constructing the Anniston disposal facility, the Army has acted on a *Page 871 
"lessons learned" basis. That is, the Army has benefited from the experience of two other chemical-weapon disposal facilities — at Johnson Atoll and at the Tooele Chemical Agent Disposal Facility in Utah. The lessons learned from the operation of those facilities have been incorporated into safety measures at the Anniston facility. Because the scientific and technological basis for assessing the health risks of incineration is subject to change, we think it would be unwise for any health risk assessment to be "generally applicable" and therefore promulgated as a binding "rule." See40 C.F.R. § 300.430(e)(2)(i)(A)(2) ("For known or suspected carcinogens, acceptable exposure levels are generally concentration levels that represent an excess upper bound lifetime cancer risk to an individual of between 10-6 and 10-4") (emphasis added).
Based on the foregoing authorities, we hold that the cancer-risk factor derived from the 1994 EPA Guidance was not a legislative "rule" subject to notice-and-comment rulemaking.
 II.
Families argues that ADEM failed to comply with Ala. Admin. Code R.335-14-5-.04. That Rule (which is reproduced in full in Appendix B to this opinion) requires "each owner or operator [of a hazardous-waste facility to have] a contingency plan for his facility." Families contends that ADEM erroneously interpreted the Rule to require a contingency plan that addresses only on-site hazards to human health and the environment, whereas, Families maintains, the correct interpretation of the Rule is to require a contingency plan that addresses both on-site and off-site hazards. A careful reading of the relevant testimony elicited at the administrative hearing, as well as the hearing officer's findings of fact and conclusions of law on this issue compels the conclusion that the hearing officer did not interpret the Rule to require a contingency plan that addresses only on-site hazards.
Initially we note that the hearing officer specifically found:
 "[T]he regulation at issue envisions a contingency plan that is designed to eliminate hazards. At times during the trial hearing, [Families] attempted to change the standard to require a plan that absolutely eliminates all hazards. Unfortunately, no plan can eliminate all potential hazards from the release of chemical agent. . . . Any release of chemical agent would create the potential for hazards to human health and the environment. The only sure way to eliminate the potential hazards from a release of chemical agent is to eliminate the chemical weapons themselves, which is what this chemical weapons disposal facility is designed to do."[3] *Page 872 
The hearing officer's findings of fact on the contingency plan issue recited, among other things, that the Anniston Army Depot has a chemical accident response and assistance plan ("CAIRA Plan") in place; that the contingency plan incorporates the CAIRA Plan by reference; that "in the event response actions would be required outside the boundaries of the ANCDF [Anniston Chemical Agent Disposal Facility], the CAIRA Plan would be implemented"; that "[t]he . . . Contingency Plan describes the arrangements agreed to by local police departments, fire departments, hospitals, contractors, and state and local emergency response teams to coordinate emergency services"; that "[t]he Chemical Stockpile Emergency Preparedness Program (`CSEPP') is a federal program designed to help local communities near stockpiles to put into place plans, procedures, and technologies to effectively protect the citizens of their communities"; that "[t]he CSEPP program has provided over $30 million to Calhoun County for equipment and other assistance to allow the county to better implement emergency response procedures"; that "[t]he CSEPP program has provided to Calhoun County . . . $1.8 million for the emergency operations center currently used by Calhoun County Emergency Management Agency"; that "[t]he CSEPP program [has] fully fund[ed] seven of the ten full-time positions with the Calhoun County Emergency Management Agency. The other positions are partially funded with CSEPP funds"; that "Calhoun County can use the equipment purchased with CSEPP funds for missions and operations not related to the chemical munitions stockpile"; and that "[t]he federal government does not prohibit Calhoun County from spending its own funds for chemical stockpile preparedness." (Emphasis added.)
The hearing officer's conclusions of law state, in pertinent part:
 "4. The . . . Contingency Plan complies with the requirements of ADEM Admin. R. 335-14-5-.04.;
 "5. The Depot and the PMCD [Army Program Manager for Chemical Demilitarization] have no legal authority to direct local police, fire, emergency management, or other officials, beyond the boundaries of the Depot.
 "6. The Depot and the PMCD cannot be legally responsible for the actions or inactions of local police, fire, emergency management, or other officials."
The hearing officer's findings of fact are fully supported by the record and Families does not dispute them. In other words, Families agrees that the contingency plan includes all the steps recited by the hearing officer — that the Army has recommended, planned, coordinated, and funded local emergency-response measures and procedures. The hearing officer found, and our review confirms, that those steps comply with parts 3(c), 7(a)(2), 7(d)(2), 7(d)(2)(i) through (vi), and 7(i) of Rule335-14-5-.04, specifically relating to off-site effects and local response in the event of a chemical-weapons emergency.
Apparently, Families also agrees that items 5 and 6 of the hearing officer's conclusions of law are correct. That is, Families does not dispute that the Army has "no legal authority to direct" and "no legal responsibility for" the actions of local police, fire, emergency management, or other officials, beyond the boundaries of the Depot. Nevertheless, Families maintains, the Army's inability to enforce or require off-site preparedness measures is not determinative because, it says, unless permit applicants develop and implement a plan to address off-site hazards, they have not complied with the requirements of Rule335-14-5-.04. That argument implies that, regardless of the Army's legal inability *Page 873 
to do more than make recommendations to local officials, and irrespective of the Army's attempts to plan, coordinate, and fund local emergency-response measures and procedures, Rule 335-14-5-.04 makes the Army the guarantor of the off-site population's readiness. We cannot accept such a strained reading of the rule. First, the rule requires an operator to have a contingency plan "for his facility." The "facility" is the Army Depot. Second, contrary to Families' argument, the Army's contingency plan does address off-site hazards.
The plan requires the Army to communicate, coordinate, and plan with local officials. The contingency plan demonstrates that the Army has done those things. In addition, the Army has funded local preparedness efforts. Rule 335-14-5-.04 does not require that the Army guarantee local readiness.
The judgment of the Montgomery Circuit Court is affirmed.
OPINION OF OCTOBER 18, 2001, WITHDRAWN; OPINION SUBSTITUTED; APPLICATION OVERRULED; AFFIRMED.
Yates, P.J., and Pittman, J., concur.
Thompson and Murdock, JJ., concur in the result.
[1] The Johnson Atoll facility has apparently completed its incineration operations.
[2] The following testimony was elicited at the administrative hearing:
 "Q. [By Major Ayres] And what's your understanding of what will happen to th[e] information that's produced as a result of th[e] trial burn?
 "A. [By Drew Lyle, acting team leader for the environmental team of the program manager for chemical demilitarization] The information from the trial burn will be looked at to see whether or not it has an impact on the health risk assessment. If the emissions from the facility seem to be a lot lower than what was initially predicted . . . the Army just needs to provide an analysis to ADEM on whether or not the impact of the health risk assessment is going to increase or decrease risk that was previously projected by the risk assessment done for the application.
 "Q. So if I understand your testimony, the emissions data from the trial burn will then be compared to the screening risk assessment that's already done?
"A. Correct.
". . . .
 "Q. Could you read directly from the permit the portions that deal with this issue?
 "A. [A]fter each trial burn . . . and after the performance test . . . the permittee shall submit to the department a risk assessment addendum (RAA)
following the revised protocol provided for in condition I.K.4 of this permit which shall compare the results of each trial burn or performance test to the data used in the preliminary risk assessment with respect to emission estimates, stack parameters, and toxicology values."
(Emphasis added.)
[3] The record contains evidence that the risks inherent in continuing to store the chemical weapons are much greater than the risks attendant to incinerating the weapons. See Chemical Weapons Working Group, Inc. v.United States Dep't of the Army, 111 F.3d 1485, 1489 (10th Cir. 1997);Chemical Weapons Working Group, Inc. v. United States Dep't of the Army,963 F. Supp. 1083 (D.Utah 1997). Summarizing an Army quantitative accident risk assessment ("QRA"), the federal district court for the District of Utah stated:
 "The final QRA concluded that, on average, 34 days of continued storage of the [chemical weapons] stockpile incurs a public risk equal to that associated with the entire 7.1 years of [incineration] operations. If rare events such as earthquakes and aircraft accidents are removed from the assessment, the finding is stronger — the risk to the public from the entirety of [incineration] operations is equaled by the risk of only 2.3 days of continued storage. The final QRA also concludes that a one year delay in processing will approximately double the risk to the population surrounding the stockpile."
963 F. Supp. at 1092 (footnote omitted). *Page 874 
 APPENDIX A ALABAMA ADMINISTRATIVE CODE ALABAMA DEPARTMENT OF ENVIRONMENTAL MANAGEMENT LAND DIVISION — HAZARDOUS WASTE PROGRAM CHAPTER 335-14-8. PERMIT PROGRAM COPYRIGHT (C) 2001 BY STATE OF ALABAMA. ALL RIGHTS RESERVED Current through June 30, 2001
335-14-8-.08 Procedures For Decisionmaking — Treatment, Storage,And Disposal Facility Permits.
(1) Specific Procedures Applicable to AHWMMA Permits.
(a) Pre-application public meeting and notice.
1. Applicability. The requirements of 335-14-8-.08(1)shall apply to all AHWMMA Part B applications seeking initial permits for hazardous waste management units over which ADEM has permit issuance authority. The requirements of 335-14-8-.08(1) shall also apply to AHWMMA Part B applications seeking renewal of permits for such units, where the renewal application is proposing a significant change in facility operations. For the purposes of 335-14-8-.08(1), a "significant change" is any change that would qualify as a major permit modification under 335-14-8-.04(2). The requirements of 335-14-8-.08(1) do not apply to permit modifications under 335-14-8-.04(2) and (3) or to applications that are submitted for the sole purpose of conducting post-closure activities or post-closure activities and corrective action at a facility.
2. Prior to the submission of an AHWMMA Part B permit application for a facility, the applicant must hold at least one meeting with the public in order to solicit questions from the community and inform the community of proposed hazardous waste management activities. The applicant shall post a sign-in sheet or otherwise provide a voluntary opportunity for attendees to provide their names and addresses.
3. The applicant shall submit a summary of the meeting, along with the list of attendees and their addresses developed under 335-14-8-.08(1)(a)2., and copies of any written comments or materials submitted at the meeting, to the Department as a part of the Part B application, in accordance with 335-14-8-.02(5)(b).
4. The applicant must provide public notice of the pre-application meeting at least 30 days prior to the meeting. The applicant must maintain, and provide to the Department upon request, documentation of the notice.
(i) The applicant shall provide public notice in all of the following forms:
(I) A newspaper advertisement. The applicant shall publish a notice, fulfilling the requirements in 335-14-8-.08(1)(a)4.(ii), in a newspaper of general circulation in the county or equivalent jurisdiction that hosts the proposed location of the facility. In addition, the Department shall instruct the applicant to publish the notice in newspapers of general circulation in adjacent counties or equivalent jurisdictions, where the Department determines that such publication is necessary to inform the affected public. The notice must be published as a display advertisement.
(II) A visible and accessible sign. The applicant shall post a notice on a *Page 875 
clearly marked sign at or near the facility, fulfilling the requirements in 335-14-8-.08(1)(a)4.(ii). If the applicant places the sign on the facility property, then the sign must be large enough to be readable from the nearest point where the public would pass by the site.
(III) A broadcast media announcement. The applicant shall broadcast a notice, fulfilling the requirements in 335-14-8-.08(1)(a)4.(ii), at least once on at least one local radio station or television station. The applicant may employ another medium with prior approval of the Department.
(IV) A notice to the Department. The applicant shall send a copy of the newspaper notice to the Department and to the appropriate units of State of Alabama and local government, in accordance with335-14-8-.08(6)(c)1.(v).
(ii) The notices required under 335-14-8-.08(1)(a)4.(i) must include:
(I) The date, time, and location of the meeting;
(II) A brief description of the purpose of the meeting;
(III) A brief description of the facility and proposed operations, including the address or a map (e.g., a sketched or copied street map) of the facility location;
(IV) A statement encouraging people to contact the facility at least 72 hours before the meeting if they need special access to participate in the meeting; and
(V) The name, address, and telephone number of a contact person for the applicant.
(b) Public notice requirements at the application stage.
1. Applicability. The requirements of 335-14-8-.08(1) shall apply to all AHWMMA Part B applications seeking initial permits for hazardous waste management units over which ADEM has permit issuance authority. The requirements of 335-14-8-.08(1) shall also apply to AHWMMA Part B applications seeking renewal of permits for such units under335-14-8-.05(2). The requirements of 335-14-8-.08(1) do not apply to permit modifications pursuant to 335-14-8-.04(2) and (3) or permit applications submitted for the sole purpose of conducting post-closure activities or post-closure activities and corrective action at a facility.
2. Notification at application submittal.
(i) The Department shall provide public notice as set forth in335-14-8-.08(6)(c)1.(iv), and notice to appropriate units of State of Alabama and local government as set forth in 335-14-8-.08(6)(c)1.(v), that a Part B permit application has been submitted to the Department and is available for review.
(ii) The notice shall be published within a reasonable period of time after the application is received by the Department. The notice must include:
(i) The name and telephone number of the applicant's contact person;
(ii) The name and telephone number of the Department's contact office, and a mailing address to which information, opinions, and inquiries may be directed throughout the permit review process;
(iii) An address to which people can write in order to be put on the facility mailing list;
(iv) The location where copies of the permit application and any supporting documents can be viewed and copied;
(v) A brief description of the facility and proposed operations, including the address or a map (e.g., a sketched or copied street map) of the facility *Page 876 
location on the front page of the notice; and
(vi) The date that the application was submitted.
3. Concurrent with the notice required under 335-14-8-.08(1)(b)2., the Department must place the permit application and any supporting documents in a location accessible to the public in the vicinity of the facility or at the Department's office.
(c) Information repository.
1. Applicability. The requirements of 335-14-8-.08(1) apply to all applications seeking AHWMMA permits for hazardous waste management units over which ADEM has permit issuance authority.
2. The Department may assess the need, on a case-by-case basis, for an information repository. When assessing the need for an information repository, the Department shall consider a variety of factors, including: the level of public interest; the type of facility; the presence of an existing repository; and the proximity to the nearest copy of the administrative record. If the Department determines, at any time after submittal of a permit application, that there is a need for a repository, then the Department shall notify the facility that it must establish and maintain an information repository. (See 335-14-8-.03(1)(m) for similar provisions relating to the information repository during the life of a permit.)
3. The information repository shall contain all documents, reports, data, and information deemed necessary by the Department to fulfill the purposes for which the repository is established. The Department shall have the discretion to limit the contents of the repository.
4. The information repository shall be located and maintained at a site chosen by the facility. If the Department finds the site unsuitable for the purposes and persons for which it was established, due to problems with the location, hours of availability, access, or other relevant considerations, then the Department shall specify a more appropriate site.
5. The Department shall specify requirements for informing the public about the information repository. At a minimum, the Department shall require the facility to provide a written notice about the information repository to all individuals on the facility mailing list.
6. The facility owner/operator shall be responsible for maintaining and updating the repository with appropriate information throughout a time period specified by the Department. The Department may close the repository at its discretion, based on the factors in 335-14-8-.08(1)(c)2.
(2) Application for a permit.
(a) Any person who requires a permit shall complete, sign, and submit to the Department an application for each permit required under 335-14-8-.01(1).
(b) The Department shall not begin the processing of a permit until the applicant has fully complied with the requirements for that permit as set out in the applicable portions of 335-14-8.
(c) Permit applications must comply with the signature and certification requirements of 335-14-8-.02(2).
(d) The Department shall review for completeness every application for a permit. Upon completing the review, the Department shall notify the applicant in writing whether the application is complete. If the application is incomplete, the Department shall list the information necessary to make the application *Page 877 
complete. The Department shall specify in the notice of deficiency a date for submitting the necessary information. The Department may request any information necessary to clarify, modify, or supplement previously submitted material but requests for items not required by Rules 335-14-8-.02 or 335-14-8-.13 will not render an application incomplete.
(e) If an applicant fails or refuses to correct deficiencies in the application, the permit may be denied and appropriate enforcement action may be taken.
(3) Modification, revocation and reissuance or termination of permits.
(a) Permits may be modified, revoked and reissued, or terminated either at the request of any interested person (including the permittee) or upon the Department's initiative. However, permits may only be modified, revoked and reissued, or terminated for the reasons specified in335-14-8-.04(2) or (4). All requests shall be in writing and shall contain facts or reasons supporting the request.
(b) If the Department decides that the request is not justified, it shall send the requester a brief written response giving a reason for the decision. Denials of such requests are not subject to public notice, comment or hearings.
(c)1. If the Department tentatively decides to modify or revoke and reissue a permit under 335-14-8-.04(2), it shall prepare a draft permit under 335-14-8-.08(4) incorporating the proposed changes. The Department may request additional information and, in the case of a modified permit, may require the submission of an updated application. In case of revoked and reissued permits, the Department shall require the submission of a new application.
2. In a permit modification under 335-14-8-.08(3), only those conditions to be modified shall be reopened when a new draft permit is prepared. All other aspects of the existing permit shall remain in effect for the duration of the unmodified permit. When a permit is revoked and reissued under 335-14-8-.08(3), the entire permit is reopened just as if the permit had expired and was being reissued. During any revocation and reissuance proceeding, the permittee shall comply with all conditions of the existing permit until a new final permit is reissued.
3. Minor modifications as defined in 335-14-8-.04(3) are not subject to the requirements of 335-14-8-.08(3).
(d) If the Department tentatively decides to terminate a permit under335-14-8-.04(4), it shall issue a notice of intent to terminate. A notice of intent to terminate is a type of draft permit which follows the same procedures of any draft permit prepared under 335-14-8-.08(4).
(4) Draft permits.
(a) Once an application is complete, the Department shall tentatively decide whether to prepare a draft permit or deny the application.
(b) If the Department tentatively decides to deny the permit application, it shall issue a notice of intent to deny. A notice of intent to deny the permit application is a type of draft permit prepared under335-14-8-.08(4). If the Department's final decision is that the tentative decision to deny the permit application was incorrect, it shall withdraw the notice of intent to deny and proceed to prepare a draft permit under335-14-8-.08(4)(c).
(c) If the Department decides to prepare a draft permit, it shall prepare a draft permit that contains the following information: *Page 878 
1. All conditions under 335-14-8-.03(1) and (3);
2. All compliance schedules under 335-14-8-.03(4);
3. All monitoring requirements under 335-14-8-.03(2); and
4. Standards for treatment, storage or disposal and other permit conditions under 335-14-8-.03(1).
(d) Draft permits prepared under 335-14-8-.08(4) shall be accompanied by a fact sheet if required under 335-14-8-.08(5).
(5) Fact sheet.
(a) A fact sheet shall be prepared for every draft permit for a major HWM facility and for every draft permit that the Department finds is the subject of widespread public interest or raises major issues. The fact sheet shall briefly set forth the principal facts and the significant factual, legal, methodological, and policy questions considered in preparing the draft permit. The Department shall send this fact sheet to the applicant and, upon request, to any other person.
(b) The fact sheet shall include when applicable:
1. A brief description of the type of facility or activity which is the subject of the draft permit;
2. The type and quantity of wastes which are proposed to be or are being treated, stored, or disposed of;
3. A brief summary of the basis for the draft permit conditions including references to applicable statutory or regulatory provisions;
4. Reasons why any requested variances or alternatives to required standards do not appear justified;
5. A description of the procedures for reaching a final decision on the draft permit including:
(i) The beginning and ending dates of the comment period under335-14-8-.08(6) and the address where comments will be received;
(ii) Procedures for requesting a hearing or the date and time of the hearing if scheduled at the time the draft permit is issued, and the nature of the hearing;
(iii) Any other procedures by which the public may participate in the final decision; and
6. Name and telephone number of a person to contact for additional information.
(6) Public notice of permit actions and public comment period.
(a) Scope.
1. The Department shall give public notice that the following actions have occurred:
(i) A permit application has been tentatively denied under335-14-8-.04(4)(b);
(ii) A draft permit has been prepared under 335-14-8-.08(4)(c); or
(iii) A hearing has been scheduled under 335-14-8-.08(8).
2. No public notice is required when a request for permit modification, revocation and reissuance, or termination is denied under335-14-8-.08(3)(b). Written notice of the denial shall be given to the requester and to the permittee.
3. Public notices may describe more than one permit or permit action.
(b) Timing.
1. Public notice of the preparation of a draft permit required under 335-14-8-.08(6)(a) shall allow at least 45 days for public comment.
2. Public notice of a public hearing shall be given at least 30 days before the *Page 879 
hearing. (Public notice of the hearing may be made in the notice in 335-14-8-.08(6)(b)1.)
(c) Public notice of activities described in 335-14-8-.08(6)(a)1. shall be given by the following methods:
1. By mailing a copy of a notice to the following persons (any person otherwise entitled to receive notice under 335-14-8-.08(6)(c) may waive his right to receive notice):
(i) The applicant;
(ii) Any other agency which the Department knows has issued or is required to issue a RCRA, UIC, PSD, NPDES or 404 permit for the same facility or activity;
(iii) Federal and State of Alabama agencies with jurisdiction over fish, shellfish, and wildlife resources and over coastal zone management plans, the Advisory Council on Historic Preservation, State of Alabama Historic Preservation Officers, including any affected States (Indian Tribes). (For purposes of 335-14-8-.08(6)(c), and in the context of the Underground Injection Control Program only, the term State includes Indian Tribes treated as States.)
(iv) Persons on a mailing list developed by:
(I) Including those who request in writing to be on the list;
(II) Soliciting persons for area lists from participants in past permit proceedings in that area; and
(III) Notifying the public of the opportunity to be put on the mailing list through periodic publication in the public press and in such publications as regional and State of Alabama funded newsletters, environmental bulletins, or State of Alabama law journals. The Department may update the mailing list from time to time by requesting written indication of continued interest from those listed. The Department may delete from the list the name of any person who fails to respond to such a request; and
(v)(I) To any unit of local government having jurisdiction over the area where the facility is proposed to be located; and
(II) To each State of Alabama agency having any authority under State of Alabama law with respect to the construction or operation of such facility.
2. Publication of a notice in a daily or weekly major local newspaper of general circulation and broadcast over local radio stations.
3. Any other method reasonably calculated to give actual notice of the action in question to persons potentially affected by it, including press releases or any other forum or medium to elicit public participation.
(d) Contents.
1. All public notices issued under 335-14-8-.08 shall contain the following minimum information:
(i) Name and address of the office processing the permit action for which the notice is being given;
(ii) Name and address of the permittee or permit applicant and, if different, of the facility or activity regulated by the permit;
(iii) A brief description of the business conducted at the facility or activity described in the permit application;
(iv) Name, address, and telephone number of a person from whom interested persons may obtain further information, including copies of the draft permit, fact sheet, and the application; and
(v) A brief description of the comment procedures required by335-14-8-.08(7) *Page 880 
and (8) and the time and place of any hearing that will be held, including a statement of procedures to request a hearing (unless a hearing has already been scheduled) and other procedures by which the public may participate in the final permit decision.
2. In addition to the general public notice described in335-14-8-.06(d)1., of the public notice for a hearing under 335-14-8-.08(8) shall contain the following information:
(i) Reference to the date of previous public notices relating to the permit;
(ii) Date, time, and place of the hearing; and
(e) A brief description of the nature and purpose of the hearing, including applicable rules and procedures. In addition to the general public notice described in 335-14-8-.08(6)(d)1., all persons identified in335-14-8-.08(6)(c)1.(i), (ii), and (iii), shall be mailed a copy of the fact sheet, the permit application and the draft permit. Upon determination of the number of these persons, the Department will inform the applicant in writing of that number and the applicant shall provide sufficient copies of the permit application to the Department as requested.
(7) Public comments and request for public hearings. During the public comment period provided under 335-14-8-.08(6), any interested person may submit written comments on the draft permit and may request a public hearing, if no hearing has already been scheduled. A request for a public hearing shall be in writing and shall state the nature of issues proposed to be raised in the hearing. All comments shall be considered in making the final decision and shall be answered as provided in 335-14-8-.08(11).
(8) Public hearings.
(a)1. The Department shall hold a public hearing whenever it finds, on the basis of requests, a significant degree of interest in a draft permit(s);
2. The Department may also hold a public hearing at its discretion, whenever, for instance, such a hearing might clarify one or more issues involved in the permit decision;
3. The Department shall hold a public hearing whenever it receives written notice of opposition to a draft permit and a request for a hearing within 45 days of public notice under 335-14-8-.08(6)(b)1.;
4. The Department shall hold a public hearing on all proposed disposal facility permits;
5. Whenever possible the Department shall schedule a hearing under335-14-8-.08(8) at a location convenient to the nearest population center to the proposed facility;
6. Public notices of the hearing shall be given as specified in335-14-8-.08(6).
(b) Any person may submit oral or written statements or data concerning the draft permit. Reasonable time limits may be set upon the time allowed for oral statements and the submission of statements in writing may be required. The comment period will automatically extend to the close of any public hearing under 335-14-8-.08(8). The hearing officer may also extend the comment period by so stating at the hearing.
(c) A written transcript of the public hearing shall be available for public inspection.
(9) Obligation to raise issues and provide information during thepublic *Page 881 comment period. All persons, including applicants, who believe that any condition of a draft permit is inappropriate or that the Department's tentative decision to deny an application, terminate a permit or prepare a draft permit is inappropriate, must raise all reasonably ascertainable issues and submit all reasonably available arguments supporting their position by the close of the comment period. Any supporting materials which are submitted shall be included in full and may not be incorporated by reference, unless they are already part of the administrative record in the same proceeding, or consist of State of Alabama or federal statutes or regulations, Department documents of general applicability or other generally available reference materials. Commenters shall make supporting documents not already included in the administrative record available to the Department as it shall direct.
(10) Reopening of the public comment period.
(a) 1. The Department may order the comment period reopened if the procedures of 335-14-8-.08(10)(a) could expedite the decision making process. When the public comment period is reopened under335-14-8-.08(10)(a), all persons, including applicants, who believe any condition of a draft permit is inappropriate or that the Department's tentative decision to deny an application, terminate a permit or prepare a draft permit is inappropriate must submit all reasonable available factual grounds supporting their position, including all supporting material, by a date, not less than sixty days after public notice under335-14-8-.08(10)(a)2., set by the Department. Thereafter, any person may file a written response to the material filed by any other person, by a date, not less than twenty days after the date set for filing of the material, set by the Department.
2. Public notice of any comment period under 335-14-8-.08(10)(a) shall identify the issues to which the requirements of 335-14-8-.08(10)(a) apply.
(b) If any data, information, or arguments submitted during the public comment period, including information or arguments required under335-14-8-.08(9), appear to raise substantial new questions concerning a permit, the Department may take one or more of the following actions:
1. Prepare a new draft permit, appropriately modified, under335-14-8-.08(4);
2. Prepare a revised fact sheet under 335-14-8-.08(5) and reopen the comment period under 335-14-8-.08(10); or
3. Reopen or extend the comment period under 335-14-8-.08(6) to give interested persons an opportunity to comment on the information or arguments submitted.
(c) Comments filed during the reopened comment period shall be limited to the substantial new questions that caused its reopening. The public notice under 335-14-8-.08(6) shall define the scope of the reopening.
(d) Public notice of any of the actions in 335-14-8-.08(10) shall be given as specified in 335-14-8-.08(6).
(11) Response to comments.
(a) At the time any final permit is issued, the Department shall issue a responses to comments. This response shall:
1. Specify which provisions, if any, of the draft permit have been changed in the final permit and the reasons for the change; and
2. Briefly describe and respond to all significant comments on the draft permit raised during the public comment period, or during any hearing. *Page 882 
(b) The response to comments shall be available to the public.
(12) Issuance of permit. After the close of the public comment period under 335-14-8-.08(6) on a draft permit, the Department shall issue a final permit decision [or a decision to deny a permit for the active life of a AHWMMA hazardous waste management facility or unit under335-14-8-.02(20)].
(13) Severability. If an appeal of a final permit decision under335-14-8-.08(12) is sought under Code of Ala. 1975, § 22-22A-7
and a portion of the permit decision is stayed as provided in Codeof Ala. 1975, § 22-22A-7(c)(4):
(a) Uncontested conditions which are not severable from those contested shall be stayed together with the contested conditions;
(b) All other provisions shall remain fully effective and enforceable; and
(c) Existing facilities shall remain subject to the interim status permit standards in Chapter 335-14-6 in lieu of any stayed provisions.
Authors: Stephen C. Maurer; Stephen A. Cobb; Amy P. Zachry; C. Edwin Johnston
Statutory Authority: Code of Ala. 1975, §§ 22-30-11, 22-30-12.
History: July 19, 1982. Amended: April 9, 1986; September 29, 1986; August 24, 1989; December 6, 1990; January 1, 1993. Amended: Filed: November 30, 1994 effective January 5, 1995. Amended: Filed February 21, 1997; effective March 28, 1997. Amended: Filed March 9, 2001; effective April 13, 2001. Amended: Filed February 8, 2002; effective March 15, 2002. *Page 883 
 APPENDIX B
335-14-5-.04 Contingency Plan And Emergency Procedures.
(1) Applicability.
The requirements of 335-14-5-.04 apply to owners and operators of all hazardous waste facilities, except as 335-14-5-.01(1) provides otherwise.
(2) Purpose and implementation of contingency plan.
(a) Each owner or operator must have a contingency plan for his facility. The contingency plan must be designed to minimize hazards to human health or the environment from fires, explosions, or any unplanned sudden or non-sudden release of hazardous waste or hazardous waste constituents to air, soil, or surface water.
(b) The provisions of the plan must be carried out immediately whenever there is a fire, explosion, or release of hazardous waste or hazardous waste constituents which could threaten human health or the environment.
(3) Content of contingency plan.
(a) The contingency plan must describe the actions facility personnel must take to comply with 335-14-5-.04(2) and (7) in response to fires, explosions, or any unpermitted sudden or non-sudden release of hazardous waste or hazardous waste constituents to air, soil, or surface water at the facility.
(b) If the owner or operator has already prepared a Spill Prevention, Control and Countermeasures (SPCC) Plan or some other emergency or contingency plan, he need only amend that plan to incorporate hazardous waste management provisions that are sufficient to comply with the requirements of 335-14-5.
(c) The plan must describe arrangements agreed to by local police departments, fire departments, hospitals, contractors, and State of Alabama and local emergency response teams to coordinate emergency services, pursuant to 335-14-5-.03(8).
(d) The plan must list names, and office and home addresses and phone numbers of all persons qualified to act as emergency coordinator (see335-14-5-.04(6)), and this list must be kept up to date. Where more than one person is listed, one must be named as primary emergency coordinator and others must be listed in the order in which they will assume responsibility as alternates. For new facilities, this information must be supplied to the Department at the time of certification, rather than at the time of permit application.
(e) The plan must include a list of all emergency equipment at the facility [such as fire extinguishing systems, spill control equipment, *Page 884 
communications and alarm systems (internal and external)], and decontamination equipment, where this equipment is required. This list must be kept up to date. In addition, the plan must include the location and a physical description of each item on the list, and a brief outline of its capabilities.
(f) The plan must include an evacuation plan for facility personnel where there is a possibility that evacuation could be necessary. This plan must describe signal(s) to be used to begin evacuation, evacuation routes, and alternate evacuation routes (in cases where the primary routes could be blocked by releases of hazardous waste or fires).
(4) Copies of the contingency plan.
A copy of the contingency plan and all revisions to the plan must be:
(a) Maintained at the facility; and
(b) Submitted to all local police departments, fire departments, hospitals, and State of Alabama and local emergency response teams that may be called upon to provide emergency services. Documentation of compliance with this requirement must be maintained at the facility.
(5) Amendment of contingency plan.
The contingency plan must be reviewed, and immediately amended if necessary, whenever:
(a) The facility permit is revised;
(b) The plan fails in an emergency;
(c) The facility changes — in its design, construction, operation, maintenance, or other circumstances — in a way that materially increases the potential for fires, explosions, or releases of hazardous waste or hazardous waste constituents, or changes the response necessary in an emergency;
(d) The list of emergency coordinators changes; or
(e) The list of emergency equipment changes.
(6) Emergency coordinator.
At all times, there must be at least one employee either on the facility premises or on call (i.e., available to respond to an emergency by reaching the facility within a short period of time) with the responsibility for coordinating all emergency response measures. This emergency coordinator must be thoroughly familiar with all aspects of the facility's contingency plan, all operations and activities at the facility, the location and characteristics of waste handled, the location *Page 885 
of all records within the facility, and the facility layout. In addition, this person must have the authority to commit the resources needed to carry out the contingency plan.
(7) Emergency procedures.
(a) Whenever there is an imminent or actual emergency situation, the emergency coordinator (or his designee when the emergency coordinator is on call) must immediately:
1. Activate internal facility alarms or communication systems, where applicable, to notify all facility personnel; and
2. Notify appropriate State of Alabama or local agencies with designated response roles if their help is needed.
(b) Whenever there is a release, fire, or explosion, the emergency coordinator must immediately identify the character, exact source, amount, and areal extent of any released materials. He may do this by observation or review of facility records or manifests, and, if necessary, by chemical analysis.
(c) Concurrently, the emergency coordinator must assess possible hazards to human health or the environment that may result from the release, fire, or explosion. This assessment must consider both direct and indirect effects of the release, fire, or explosion (e.g., the effects of any toxic, irritating, or asphyxiating gases that are generated, or the effects of any hazardous surface water run-off from water or chemical agents used to control fire and heat-induced explosions).
(d) If the emergency coordinator determines that the facility has had a release, fire, or explosion which could threaten human health or the environment outside the facility (release of hazardous waste or hazardous waste constituents from the active portion of the facility is defined as such a threat), he must report his findings as follows:
1. If his assessment indicates that evacuation of local areas may be advisable, he must immediately notify appropriate local authorities. He must be available to help appropriate officials decide whether local areas should be evacuated; and
2. He must immediately notify either the government official designated as the on-scene coordinator for that geographical area or the National Response Center (800/424-8802, 24 hours a day), and the Department (334/271-7700 between 8:00 a.m. and 5:00 p.m., Monday through Friday) or the Alabama Department of Public Safety (334/242-4378, 24 hours a day). The report must include:
(i) Name and telephone number of reporter; *Page 886 
(ii) Name and address of facility;
(iii) Time and type of incident (e.g., release, fire);
(iv) Name and quantity of material(s) involved, to the extent known;
(v) The extent of injuries, if any; and
(vi) The possible hazards to human health or the environment outside the facility.
(e) During an emergency, the emergency coordinator must take all reasonable measures necessary to ensure that fires, explosions, and releases do not occur, recur, or spread to other hazardous waste at the facility. These measures must include, where applicable, stopping processes and operations, collecting and containing release waste, and removing or isolating containers.
(f) If the facility stops operations in response to a fire, explosion, or release, the emergency coordinator must monitor for leaks, pressure buildup, gas generation, or ruptures in valves, pipes, or other equipment, wherever this is appropriate.
(g) Immediately after an emergency, the emergency coordinator must provide for treating, storing, or disposing of recovered waste, contaminated soil, or surface water, or any other material that results from a release, fire, or explosion at the facility.
(h) The emergency coordinator must ensure that, in the affected area(s) of the facility:
1. No waste that may be incompatible with the released material is treated, stored, or disposed of until cleanup procedures are completed; and
2. All emergency equipment listed in the contingency plan is cleaned and fit for its intended use before operations are resumed.
(i) The owner or operator must notify the Department and other appropriate State of Alabama and local authorities that the facility is in compliance with 335-14-5-.04(7)(h) before operations are resumed in the affected area(s) of the facility.
(j) The owner or operator must note in the operating record the time, date, and details of any incident that requires implementing the contingency plan. Within 15 days after the incident, he must submit a written report on the incident to the Department. The report must include:
1. Name, address, and telephone number of the owner or operator.
2. Name, address, and telephone number of the facility; *Page 887 
3. Date, time, and type of incident (e.g., fire, explosion);
4. Name and quantity of material(s) involved;
5. The extent of injuries, if any:
6. An assessment of actual or potential hazards to human health or the environment, where this is applicable; and
7. Estimated quantity and disposition of recovered material that resulted from the incident.